447 N.W.2d 205 (1989)
R.S., an adult, Appellant,
v.
STATE of Minnesota, Hennepin County, Respondents.
No. C6-89-824.
Court of Appeals of Minnesota.
October 31, 1989.
Review Granted December 29, 1989.
*207 Dennis L. Smith, Dennis D. Daly, Jr., Roseville, Theodore J. Collins, Collins, Buckley, Sauntry & Haugh, St. Paul, for R.S.
Hubert H. Humphrey, III, Atty. Gen., Julie K. Harris, David P. Iverson, Asst. Attys. Gen., St. Paul, for State.
Thomas L. Johnson, Hennepin County Atty., Therese Galatowitsch, Asst. County Atty., Minneapolis, for Hennepin County.
Heard, considered and decided by WOZNIAK, C.J., and HUSPENI and RANDALL, JJ.

OPINION
RANDALL, Judge.
R.S. appeals from a summary judgment and Rule 12.02 dismissal of his declaratory judgment action wherein he requested the court interpret and determine the constitutionality of Minn.Stat. § 626.556 (Reporting of Maltreatment of Minors Act). The trial court concluded this case is not amenable to remedy by a declaratory judgment action. We affirm in part and reverse in part.

FACTS
On November 12, 1987, an employee of Hennepin County Community Child Protection Services (HCCPS) received an anonymous phone call regarding R.S.'s then seven-year-old daughter, R.M.S. The caller described certain behavior, but did not allege that R.M.S. had been a victim of sexual abuse, and neither alleged nor hinted that either of her parents might be involved if any abuse were to be found.
During the conversation, the caller mentioned that a therapist their family had talked to suggested calling to report R.M. S.'s behavior. The caller's child had been exhibiting somewhat strange and different behavior, and that led to the inference that R.M.S. was exhibiting similar behavior.
The information was forwarded to Terry Stark, an HCCPS supervisor. He reviewed the information on November 16 and sent the report on November 17 to Paula Leahy, a social worker, for further assessment. Stark did not immediately notify the Golden Valley Police Department (GVPD). Leahy made her assessment and orally notified the GVPD of the report on November 18. She sent a written report on November 19, which indicated that the identity of the perpetrator was "unknown." The *208 child's parents were not notified about the report or the investigation.
On December 1, Officer Smith of the GVPD called Noble Elementary School and advised the principal that he would be coming to school the next day with a representative from HCCPS to question a child. No written notice was given to school officials prior to the interview with R.M.S.
On December 2, R.M.S. was taken from her class by a teacher and presented to Leahy and Smith for questioning. Leahy testified that R.M.S. was told she was not in trouble, could leave whenever she wanted, and would be asked a few questions but was not required to answer them.
During the interview, Leahy questioned R.M.S. while showing her a picture of a naked girl, writing R.M.S.'s name below the words "my body," and circling the breast, crotch and buttocks areas and writing "vaginal" between the legs. They also discussed the concepts of "good touch" and "bad touch."
On December 3, Leahy sent a letter to R.S. and his wife informing them that HCCPS had received a report concerning their family and wanted to talk to them about it. The letter did not disclose that R.M.S. had been questioned, that HCCPS suspected sexual abuse, or which of R.S.'s two children were involved.
R.S. received the letter on December 5 and at that time learned from R.M.S. what had happened. When he was unable to reach Leahy by phone, R.S. called the GVPD and was contacted by Officer Smith later that night. Smith advised R.S. of the sequence of events and told him a report had already been filed, stating that R.M.S. had not been abused.
R.S. reached Leahy by phone on December 7. In that conversation, Leahy informed R.S. that it was her conclusion the report alleging possible sexual abuse of R.M.S. was not "validated."
On December 8, Leahy prepared a letter to Noble School and mailed it with the written notice. The written notice was required by statute to have been given to the school before R.M.S. was questioned. The teacher who removed R.M.S. from class signed the notice and backdated her signature to the date of the interview at the instruction of the school's principal.
The anonymous reporters contacted HCCPS subsequent to R.M.S.'s interview. They disclosed their identities as R.S.'s neighbors, and stated that their daughter was a friend of R.M.S. Even with the anonymous callers identifying themselves and giving the source of their observations, nothing was gleaned implicating R.M.S.'s parents. Ultimately, the report concerning R.M.S. was classified as "unable to substantiate."
R.S. commenced a declaratory judgment action. However, the trial court found no justiciable controversy for which R.S. has had standing. Notwithstanding those obstacles, the trial court analyzed the constitutional issue and determined that the statute does not violate either the United States or Minnesota Constitutions.

ISSUES
1. Did the trial court err in granting Hennepin County's motion to dismiss for failure to state a claim upon which relief can be granted after it considered matters outside the pleadings?
2. Did the trial court err in granting the State of Minnesota's summary judgment motion?

ANALYSIS

I.

Motion to Dismiss
R.S. argues the trial court erred in granting respondent Hennepin County's motion to dismiss for failure to state a claim upon which relief can be granted because the county presented matters outside the pleadings in its memorandum to the trial court.
We believe the court properly treated the motion as one for summary judgment pursuant to Minn.R.Civ.P. 12.02, and it should be reviewed under that standard.

*209 II.

Summary Judgment
In reviewing an appeal from summary judgment, this court must determine whether any genuine issues of fact exist and whether the trial court erred in applying the law. Betlach v. Wayzata Condominium, 281 N.W.2d 328 (Minn.1979). The evidence must be viewed in the light most favorable to the party against whom the motion was granted. Grondahl v. Bulluck, 318 N.W.2d 240, 242 (Minn.1982).
R.S. claims he has presented a justiciable controversy for which he has standing. He contends his right of privacy has been denied by respondents' actions pursuant to Minn.Stat. § 626.556 and alleges he has been the victim of either an unconstitutional statute or of Hennepin County's failure to follow statutory procedures.

Justiciable Controversy
A justiciable controversy must exist before a court has jurisdiction to render a declaratory judgment regarding the constitutionality of a statute. St. Paul Area Chamber of Commerce v. Marzitelli, 258 N.W.2d 585, 587 (Minn.1977). The controversy must be justiciable in the sense that definite and concrete assertions of right are involved. Seiz v. Citizens Pure Ice Co., 207 Minn. 277, 281, 290 N.W. 802, 804 (1940). The litigant bringing the constitutional challenge must "be able to show that the statute is, or is about to be, applied to his disadvantage." St. Paul Area Chamber of Commerce, 258 N.W.2d at 588 (quoting State ex rel. Smith v. Haveland, 223 Minn. 89, 92, 25 N.W.2d 474, 477 (1946)). Furthermore, the party's direct interest in the validity of the statute must be different in character from the general public's interest. Arens v. Village of Rogers, 240 Minn. 386, 390, 61 N.W.2d 508, 512 (1953).
In the present case, R.S. has a legitimate dispute and assigns as error the following actions by Hennepin County:
1. the failure to give the school a statutorily required notice;
2. the deliberate backdating of the required notice and mailing appellant a copy of the notice which they knew to be false;
3. the maintenance of that falsely dated notice in its records;
4. the failure to have a proper county chair or his designee review each notice;
5. the practice of signing these statutorily required notices in blank;
6. the failure to obtain as much information as possible from reporters including the practice of failing to ask if the caller knows or suspects who the perpetrator is;
7. the failure to get specific information supporting an allegation of physical or sexual abuse amounting to criminal acts;
8. the failure to require in every case of questioning a child which takes place without parental consent or knowledge that there be some evidence or even reasonable suspicion that the parent is the alleged perpetrator;
9. the practice of accepting anonymous calls as reports and based solely thereon  without making any attempt to assess the validity thereof  conducting custodial questioning without parental knowledge or consent;
10. the practice of waiting nearly 3 weeks before contacting the parents of a child the county believed may have been sexually abused where the parents were not alleged to be the source of the abuse.
Respondents concede certain statutory procedures were not followed. Specifically, the school was not given the required notice, and the backdated notice was deliberately kept in the file and sent to R.S. Hennepin County also acknowledged that required notices have been signed in blank. We hold that R.S.'s bona fide legal interest in being free from state intrusion, except for a compelling state reason, was affected in a prejudicial manner. When Hennepin County removed R.S.'s seven-year-old daughter from her classroom and questioned her about intimate sexual details without parental knowledge or consent, R.S.'s constitutionally protected right of privacy may have been violated. See State *210 ex rel. Smith v. Haveland, 223 Minn. 89, 92, 25 N.W.2d 474, 477 (1946).
Case law supports the proposition that R.S. has the right to preserve the autonomy and privacy of his family. See Griswold v. Connecticut, 381 U.S. 479, 495, 85 S.Ct. 1678, 1687, 14 L.Ed.2d 510 (1965) (private realm of family life is one in which the state should not enter); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (custody, care and nurture of child resides first in parents); Bohn v. County of Dakota, 772 F.2d 1433, 1436 (8th Cir.1985) (tie between parent and child is among the most important protectible interests), cert. denied 475 U.S. 1014, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986). "The rights to conceive and to raise one's children have been deemed `essential,' `basic civil rights of man,' and `rights far more precious * * * than property rights.'" Id. at 1435 (citations omitted).
In asserting his right as the father of a family whose rights have been allegedly prejudiced by respondents' interpretation and enforcement of Minn.Stat. § 626.556, R.S. has demonstrated an interest that is different from that of the general public. Furthermore, the issues involved in this case are capable of repetition, yet may evade review. See In re D.M.C., 331 N.W.2d 236, 237 (Minn.1983).
Consequently, R.S. has presented a justiciable controversy.

Standing
Before the constitutionality of this statute can be challenged, R.S. must show an injury from the provision in question. Unless the rights of the party challenging the statute are affected, a litigant has no standing to invoke the court's jurisdiction. In re Schroeder, 415 N.W.2d 436, 441 (Minn.Ct.App.1987), pet. for rev. denied (Minn. Jan. 28, 1988).
The United States Supreme Court has held that parents have a constitutionally protected liberty interest in their children. Parents' rights to the companionship, care, custody and management of their children is a constitutionally protected interest that "`undeniably warrants deference and absent a powerful countervailing interest, [warrants] protection.'" Lassiter v. Department of Social Services, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159, 68 L.Ed.2d 640 (1981) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)).
Although R.S. refuses to bring in his daughter as a party plaintiff, he has standing to bring this action in his own name as a parent. R.S. is alleging violations of his constitutional rights and privileges.

Balancing of Interests
We disagree with the trial court's finding that the countervailing interest in protecting the health and welfare of abused children outweighs R.S.'s liberty and privacy interests.
The preamble to Minn.Stat. § 626.556 declares the state's policy of protecting both children and the family unit and provides in pertinent part:
The legislature hereby declares that the public policy of this state is to protect children whose health or welfare may be jeopardized through physical abuse, neglect or sexual abuse; to strengthen the family and make the home, school, and community safe for children by promoting responsible child care in all settings; * * *
Minn.Stat. § 626.556, subd. 1 (emphasis added).
Minn.Stat. § 626.556, subd. 10 describes the duties of the local welfare and law enforcement agencies upon receipt of a report alleging abuse. The portions relevant to this opinion read as follows:
(a) If the report alleges neglect, physical abuse, or sexual abuse by a parent, guardian, or individual functioning within the family as a person responsible for the child's care, the local welfare agency shall immediately conduct an assessment.
* * * * * *
(c) Authority of the local welfare agency responsible for assessing the child abuse report * * * includes, but is not limited to, authority to interview without parental consent, the alleged victim and *211 any other minors who currently reside with or who have resided with the alleged perpetrator.

Minn.Stat. § 626.556, subd. 10 (emphasis added).
In the present case, the anonymous call which precipitated the investigation contained not a hint or inference, much less articulable suspicion or probable cause, that the possible alleged victim, R.M.S., lived or had lived with an alleged perpetrator. Respondents only argument to R.S.'s position that respondents abused both the spirit and the letter of the statute is a claim that since parents are within the "statistical pool" of "possible" perpetrators whenever a child is the victim of abuse, that this "possibility" alone justifies their private interrogation of a child without first notifying the parents.
Respondents insist an investigation would be weakened if parents are contacted prior to the first interview with a child and are themselves involved in abuse. That may be, but respondents beg the question, namely, who says the parents "are themselves involved in abuse." The statute appears to set forth a clear and sensible test. If the alleged victim and any other minors currently or formerly resided with an alleged perpetrator (which could include parents, step parents, foster parents, guardians, live-in relatives, et cetera), then a local welfare agency can exercise discretion to interview the children without first notifying the parents.
The key words are "alleged perpetrator." That phrase makes a clear distinction. If a specific person is named as a possible source, and presently or formerly resided with the child, then it makes sense to consider interviewing the child without bringing the fact of the interview to that person's knowledge. However, here we do not have an alleged perpetrator, in fact, nothing remotely connected to anyone by name. The contents of the anonymous call here were merely that the caller had observed R.M.S. doing certain things and acting in such a way that the anonymous caller wanted to mention it to somebody. The word "abuse" was not even mentioned, yet the county proceeded as if there was a possibility of child abuse and a possibility that R.S.'s parents might be involved.
The bright line threshold of the statute, authorizing an interview of the child without prior parental notification if a past or present resident of the household is the alleged or possible perpetrator, is fair to both parent and child and provides the most protection for the child. Respondents have to concede that when there is a possibility of child abuse, in addition to the parents, many other groupings exist as a source. For instance, neighbors, neighbor's children, playground or school ground companions, paper carriers, home delivery personnel, service personnel, school teachers, Brownies or Scout personnel, babysitters, et cetera, are at least statistical possibilities, yet, what authority is there to smear by implication any of the numerous people in these groups unless there are at least some articulable facts supporting an allegation.
We do not find the balancing test tips anywhere near so heavily in respondents' favor as they claim. As pointed out, although parents are within the statistical pool of abusers, so are other people. As to every one of these possible abusers, except the parents themselves, notifying the parents promptly and before beginning the investigation, and before requesting an initial interview with the child, gives those in the best position, namely the parents, an immediate opportunity to keep an eye on their child in all the examples enumerated above. Absent some specific reason not to tell the parents, parents should be involved in the decision-making process.
The knowledge that from time to time an anonymous phone call may lead to a situation where the parents are the abusers, and where contacting the parents before an in-school interview may tip off the parents and perhaps slow the investigation, is not an all-persuasive reason as it depends on two very subjective "ifs." This position, urged by respondents, is akin to an argument that it is all right to tarnish nine innocent sets of parents on the chance that one guilty one might be uncovered if the *212 welfare agency and the school can interrogate the child without first contacting the parents, based only on the interrogator's speculation. Respondents' position cannot be distinguished from the proposition, odious as it seems, that all parents, without more, are suspected abusers of their children until they prove themselves innocent.[1]
There is a certain hysteria which has arisen in roughly the last decade concerning child abuse. Although serious, when ranked with homicide, aggravated assaults, armed robbery, burglaries, drug dealing, and other felonies, abuse does not occupy a special or sacrosanct position which puts it apart from the normal rules and codes of conduct, including the Bill of Rights. Yet, no other crimes seem shrouded with the mystique of child abuse. All normal concerns for persons' rights get overridden when someone says, "but we're protecting little children." No matter how heinous the crime, it is antithetical to our judicial system that the innocent can be punished lest an occasional guilty one escape.
In other words, the question before us can be reduced to, "what controls are there on the power of the state to interrogate young children about their parents without first notifying the parents?" The statute appears to authorize this serious measure only when the child lives, or has lived, with someone alleged to be the abuser. We find the statute contains the proper balancing test between the rights of the parents to control and enjoy a harmonious family unit alongside the child's right to be free from abusers. It is safer for all concerned that the statute be looked at for the balancing test rather than the subjective judgment of those responsible only for investigation, not the preservation of the family.
We find that appellant has standing and has presented the courts with a justiciable controversy. Absent an allegation that the parents are or may be involved in abuse, we hold parents must be contacted prior to the first interview with the child. Subdivision 10(c) authorizes an interview without parental consent only when the victim currently resides with or has resided with the alleged perpetrator. See Minn.Stat. § 626.556. subd. 10(c).
Having concluded that R.S. is entitled to judgment in his favor on the issues of standing, justiciability and his claim that statutory procedures outlined by the Minnesota Reporting of Maltreatment of Minors Act were not followed, we now examine the prayer for relief and find as follows:
First, we deny R.S.'s request to declare Minn.Stat. § 626.556 unconstitutional "to the extent it requires school interviews of children based solely on anonymous reports and with no intent to assess the validity of said report prior to a custodial interrogation of the child."
Second, we deny R.S.'s request, in the alternative, to require law enforcement and welfare agencies to conduct assessments of reports to determine at what point the interests of the parents become subservient to the interest of interviewing the child in private for fear of damaging the investigation. As our analysis shows, the controlling statute sets out the circumstances under which the interview can take place without parental knowledge, and if the statute is followed, the interests of the parents and child are balanced.
In addition, we deny R.S.'s blanket request to declare that anonymous, uncorroborated calls to welfare or law enforcement agencies are not deemed to be reports under the statute. We decline to make such a broad rule. An anonymous, uncorroborated call "may" form the basis of a report. However, statutory procedures *213 must be followed before an agency arranges a private interview.
Finally, we grant R.S.'s request to order Hennepin County to follow the mandates of Minn.Stat. § 626.556. Our interpretation of the law as applied to the facts of this case leads to the conclusion that statutory procedures were not followed. Thus, overall, we find the statute constitutional and instruct the agencies named therein to follow the dictates of the legislature.
The state's notice of review raised the question of whether the school interview was a fourth amendment seizure. That issue is moot and we do not decide it at this point.

DECISION
Affirmed in part and reversed in part.
HUSPENI, Judge (concurring specially).
I agree with the majority that R.S. has standing to invoke the court's jurisdiction to address the issues he raises. I also join, albeit hesitatingly, in the majority's determination that R.S. has presented a justiciable controversy to the court.[1] Further, I concur in the majority's grant of R.S.'s request that Hennepin County be required to follow the mandates of Minn.Stat. § 626.556 (Supp.1987).
I respectfully disagree, however, with the majority's determination that subd. 10(c) of Minn.Stat. § 626.556 (Supp.1987) prohibits interviewing a child without parental consent except when the child currently resides with or has resided with the alleged perpetrator. I cannot read section 10(c) so narrowly.
Reports of possible abuse may be made either by those who are mandated to do so under the statute or by those who voluntarily do so.[2] While mandatory reporters are required, and voluntary reporters may be willing, to report instances of suspected child abuse based on the reporters' observations, those observations may furnish no information enabling reporters to identify, or even to speculate on the identity of, perpetrators. Reporters often see a child outside the home; although they are well qualified to perceive that abuse has occurred, they may be completely unqualified to name or to allege its perpetrator. However, abuse is no less real merely because its perpetrator cannot be identified.
Under the majority holding, both mandated and voluntary reporters will be put on notice that they must choose either to allege that a household member is the abuser or to have the parent notified before any professional contact with the child may occur. These two choices do not result from the best reading of the statute. Subdivision 10 of section 626.556 is entitled "Duties of local welfare agency and local law enforcement agency upon receipt of a report." Paragraph (c) in part reads:
Authority of the local welfare agency responsible for assessing the child abuse report and of the local law enforcement agency for investigating the alleged abuse includes, but is not limited to, authority to interview, without parental consent, the alleged victim and any other minors who currently reside with or who have resided with the alleged perpetrator.

(Emphasis added.) The majority's interpretation of this section requires that the underlined portion apply to the alleged victim as well as to "any other minors." However, it is unlikely that the legislature would have dictated the same procedure for alleged victims of child abuse and for children not alleged to be victims. The "who currently reside with" clause most *214 reasonably applies only to "any other minors," not to "the alleged victim."
Other portions of paragraph (c) support this reading:
The interview may take place at school * * * and may take place outside the presence of the perpetrator or parent, legal custodian, guardian, or school official * * *. [T]he parent, legal custodian, or guardian shall be notified by the responsible local welfare or law enforcement agency no later than the conclusion of the investigation or assessment that this interview has occurred.
Five categories of individuals are identified in 10(c): perpetrators, parents, legal custodians, guardians and school officials. The notification provision of 10(c) is not limited to parents, legal custodians or guardians who are alleged perpetrators.
The public policy purpose of section 626.556 is
to protect children * * * to strengthen the family and make the home, school and community safe for children * * * to require the reporting of neglect, physical or sexual abuse of children * * * to provide for the voluntary reporting of abuse or neglect of children; to require the assessment and investigation of the reports; and to provide protective and counseling services in appropriate cases.
Minn.Stat. § 626.556, subd. 1 (1986).
Inherent in such a multi-purpose public policy is the necessity for balancing two very important rights: the right of a child to be free from abuse and the right of a parent to liberty and privacy in the conduct of family affairs and responsibilities. In balancing these rights it is imperative that we consider what the child and what the parent have at stake. The potential for present and future harm to the victim of child abuse is literally incalculable; the harm accruing to the liberty and privacy of a parent from one professional and benevolent interview of that child is minimal in comparison. The interview is not intended as a vehicle to encourage a child to inform on his or her parent. The child certainly is not told that the interview must be kept secret from the parent. Nor can I agree with the majority's implication that such an interview will "smear or tarnish" the parents, or that "innocent" parents are punished by having their children interviewed.[3]
Ultimately, the balancing of the two abstract concepts of freedom from abuse and family privacy cannot be performed in the vacuum that results from ignoring statistical evidence. The pool of adults with the opportunity to abuse a child is usually a rather small one. Tragically, parents are more likely than any other group to be the abusers of their children. Parents are not merely "members of a statistical pool."
The majority concluded its balancing analysis by finding within the language of section 626.556 itself a resolution in favor of the family's right to privacy. I find in the statutory language a mandate to certain professionals to report, a responsibility of professionals to assess and investigate, and the discretion of professionals to conduct interviews under appropriate conditions without parental notification. Certainly this discretion must be exercised sensitively and always with an awareness of the potentially conflicting interests involved. However, I must conclude that the safety of a child, the strength of a home, and the interest of a family to live in privacy will all ultimately be more fully advanced by an interpretation of this statute which permits recognition of the uniqueness *215 of individual children, individual parents and individual cases.
NOTES
[1] At oral argument, respondents conceded there was not even the slightest indication that one of R.M.S.'s parents was involved. Their only rejoinder was the weak quote that we didn't have any evidence they weren't involved.

We express a special concern for the actions of the civil servants and educators involved, including, but without limitation, the deliberate backdating of official reports, and the practice at the time of signing statutorily required notices in blank. The performance of mandated duties can be accomplished without resorting to such tactics. In the long run, "ends justifies means" ultimately leads to proper ends not being obtained, as the improper means subvert the process.
[1] It appears, however, that a more appropriate action would be available to R.S. pursuant to 42 U.S.C. § 1983 (1986). His argument that the Eighth Circuit holdings in Doe v. Hennepin County, 858 F.2d 1325 (8th Cir.1988); and Myers v. Morris, 810 F.2d 1437 (8th Cir.1987), cert. denied 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987) preclude a section 1983 action by him is, I believe, misplaced. In both Doe and Myers the facts of those cases prevented recovery. The availability of a 1983 action was not attacked.
[2] I agree with the majority's refusal to consider a voluntary report as categorically inferior to a mandated one.
[3] My interpretation of section 10(c) which would permit interviewing a child without parental notification even where a household member is not the alleged perpetrator of abuse should not be taken as an unqualified endorsement of the county's practices under the facts of this case, however. Although the county's noncompliance with the requirements of section (d) for notification of school officials may be termed "technical," (there is no indication in the statute of any discretion of school authorities to refuse) it was noncompliance nonetheless. The county concedes that it did not notify the appropriate police authorities within 24 hours as required by section 3(b). Although no statutory provision specifically requires prompt investigation, I am concerned that 20 days elapsed between the report here and the interview at school. Certainly, if abuse was occurring, no matter who the perpetrator, that abuse could have continued unchecked during the delay.