## BURLINGTON NORTHERN, INC. v. DEPARTMENT OF PUBLIC SERVICE AND OTHERS.

240 N. W. 2d 554.

March 26, 1976—No. 45914.

*Curtis H. Berg, Richard M. Gleason, Barry McGrath,* and *William R. Power,* for petitioner.

*Warren Spannaus,* Attorney General, *Richard G. Mark,* Assistant Solicitor General, and *Jerome L. Getz, Rod Wilson,* and *Richard S. Slowes,* Special Assistant Attorneys General, for respondents.

Heard before Sheran, C. J., and Rogosheske, Peterson, Kelly, Todd, and Yetka, JJ., and considered and decided by the court en banc.

PER CURIAM.

Burlington Northern, Inc. (BN) seeks a writ of prohibition to prevent the Public Service Commission of the State of Minnesota (PSC) from conducting a hearing as to the restoration of daily freight service on a branch line located entirely within Minnesota. BN contends that the PSC has no jurisdiction and that the Interstate Commerce Commission of the United States (ICC) has sole jurisdiction of this issue. The writ shall issue.

Procedurally, this matter arises out of an application by BN to the PSC to reduce agency service on the branch line involved. All parties agree that the PSC had jurisdiction of this issue and its determination is not related to the issue presently before the court. The PSC granted the petition to reduce agency service by its order of January 9, 1975, but further ordered that train service should not be reduced to and from Long Prairie, Minnesota, one of the communities served by the branch line. At the time of the order, service was five times per week.

On March 17, 1975, BN unilaterally reduced the train service to three times per week. On April 25, 1975, the PSC issued an order to show cause why agency service should not be restored on the branch line. On July 9, 1975, the PSC issued its order determining that agency service as reduced was adequate. How-

ever, included in that order was a further order to BN to show cause on July 31, 1975, why freight service should not be restored on a five-day-per-week basis. BN petitioned this court for a writ of prohibition directed at this order. We ordered a hearing on this petition, and the PSC has continued its show-cause hearing pending the decision of this court.

Additional facts necessary to the determination of the issue have been stipulated by the parties:

"1. The stations of Wadena, Hewitt, Bertha, Eagle Bend, Browerville, Clarissa and Long Prairie, Minnesota lie on a branch line known as Burlington Northern K Line running from Sauk Center to Park Rapids, Minnesota. Wadena lies at the junction of the K Line and Burlington Northern's mainline running between the Twin Cities and Fargo, North Dakota.

"2. Stations on Burlington Northern's K Line south of Wadena are served only by a Burlington Northern Local train, formerly designated Local 33470, now designated Local 35870. Local 35870 originates at Staples, Minnesota approximately at 8:00 A.M. It usually acquires most cars destined for stations on the K Line at the Staples yard. It travels the mainline to Wadena, performing no services on the mainline. Upon reaching Wadena, it adds any cars that may have been set out at Wadena for destinations on the K Line before proceeding along the K Line. On Mondays, Wednesdays and Fridays, Local 35870 is scheduled to proceed southerly from Wadena serving stations to and including Long Prairie. It then returns to Wadena along the K Line, and then proceeds along the mainline to Staples, where it terminates at approximately 6:00 P.M., leaving its cars for switching to other Burlington Northern trains. On Tuesdays and Thursdays Local 35870 is scheduled to proceed north from Wadena, serving stations on the K Line to and including Park Rapids, then returns along that line to Wadena before proceeding over the mainline to Staples, again performing no local service between Wadena and Staples. The rail cars transported by Local 35870 are picked up or returned at the Staples yard (with the

exception of those cars picked up at Wadena). At Staples, the cars are classified and bunched for further transport by other Burlington Northern trains.

"3. The locomotive used on Local 35870 comes from a Burlington Northern locomotive pool at Staples, and normally operates on Local 35870 for five consecutive days before returning to regular rotation in the pool. The caboose for Local 35870 is assigned to that train service, but will from time to time be used in other service. Crews on Local 35870 are called on a seniority basis from the St. Cloud crew list. Rail cars used in Local 35870 come from the railroads' freight car pool in accordance with the Association of American Railroads' interchange agreement, to which all common carrier railroads subscribe, car service rules, and railroad operating practices.

"4. The attached Table I [not included herein] shows the breakdown of actual carloads moving in intrastate commerce versus carloads moving in intrastate commerce to and from stations on the K Line south of Wadena for the first six months of 1975, as more particularly defined below.

"For the purposes of breakdown in Table I, 'interstate' means orginating beyond the boundaries of Minnesota and traveling to the destination in Minnesota in accordance with the intention of the shipper on a single bill of lading or originating in Minnesota and traveling to a destination beyond Minnesota on a single bill of lading. 'Intrastate' is defined as moving in accordance with the intention of the shipper from an origin within Minnesota to a destination within Minnesota without traveling beyond the boundaries of Minnesota.

"5. The map attached as Exhibit A [not included herein] to Burlington Northern affiant Robert Shober's affidavit accurately portrays the geography of Burlington Northern's K Line.

"6. Local 35870 operates wholly between points in Minnesota."

Table I shows that during the 6-month period involved 82.1

percent of the shipments on this branch line involved *interstate* commerce and 17.9 percent of the shipments involved *intrastate* commerce.

The issues raised are:

(1)    Is the reduction of freight service over the branch line a matter subject to exclusive regulation by the ICC?

(2)    Assuming the Interstate Commerce Act, 49 USCA, § 1, et seq., (the Act) does not preclude concurrent regulation by the PSC, do Minnesota statutes confer upon the PSC the power to regulate the curtailment of freight service?

The regulation of interstate commerce being vested in the ICC, it is necessary to evaluate the facts of each case to properly adjudicate a claim by a state regulatory agency that some particular facet of commerce is intrastate and remains within its jurisdiction.

Initially, we conclude that the PSC's reliance on the legislative history of 49 USCA, § 13a(2), is misplaced. Section 13a(2) gave the ICC jurisdiction to authorize curtailment of unprofitable service under circumstances where the railroad has been unable to obtain such authorization from each state through which its unprofitable line passed. Although not so limited on its face, § 13a(2) has been applied only to passenger service. See, Southern Ry. Co. v. North Carolina, 376 U. S. 93, 84 S. Ct. 564, 11 L. ed. 2d 541 (1964) ; New Jersey v. New York, S. & W. R. Co. 372 U. S. 1, 83 S. Ct. 614, 9 L. ed. 2d 541 (1963). The PSC does not contend that § 13a(2) applies to the freight service here involved, but construes the omission of a similar power with respect to freight operations as an indication that Congress intended the jurisdiction of the ICC over curtailment of freight service over a branch line located within a single state to be less extensive that its jurisdiction over the curtailment of intrastate passenger service over such lines. Section 13a(2) reserves to the states initial regulation over curtailment of branch line passenger service "wholly within the boundaries of a single State" even though connecting with an interstate trunk line. 1958 U. S.

Code Cong. & Adm. News 3468; 104 Cong. Rec. 10853, 85th Cong., 2d Session, June 11, 1958. If Congress intended ICC jurisdiction over curtailment of freight service to be less extensive, it would follow a fortiori here that no ICC jurisdiction exists.

We do not agree that the legislative history of § 13a(2) reflects an intent to limit ICC jurisdiction over curtailment of freight operations. As will be discussed *infra*, we believe that the ICC already had jurisdiction over curtailment of freight operations under its "car service" powers conferred in 1917, as amended in 1920. The car service provisions apply only to the transportation of property. Wisconsin R. R. Comm. v. Chicago & N. W. Ry. Co. 87 I.C.C. 195, 197 (1924). It was apparently for this reason that additional jurisdiction over the curtailment of passenger service was perceived as necessary in 1958 when § 13a (2) was added.

The parties have stipulated that 82.1 percent of the freight here involved moved in interstate commerce. The PSC seeks to avoid the exclusive jurisdiction of the ICC by focusing on the local, intrastate physical characteristics of the branch line and the local base of the crews and some of the equipment used.

The ICC has held in In re Train Service on Northern Pacific, 112 I.C.C. 191, 195 (1926), that it has exclusive jurisdiction over curtailment of freight service over a branch line under its "car service" power under pars. (10), (11), (14), and (15) of § 1 of the Act. The Northern Pacific proposed to discontinue daily train service between Beach, North Dakota, and Ollie, Montana, and establish in lieu thereof a tri-weekly service. On its own motion, the ICC instituted an investigation into this proposed curtailment of freight service, but the State of North Dakota contended that the ICC had no jurisdiction. The ICC noted that the term "car service" was defined in § 1(10) to include "the supply of trains", that § 1(11) imposed a duty upon carriers to provide "adequate car service", and that § 1(14) and § 1(15) conferred power upon the ICC to compel performance of this duty. This determination is not binding on the court since an administrative

agency may not finally decide the limits of its statutory power. Stark v. Brannan, 82 F. Supp. 614, 618 (D. D. C. 1949), affirmed, 87 App. D. C. 388, 392, 185 F. 2d 871, 875 (1950), affirmed, 342 U. S. 451, 72 S. Ct. 433, 96 L. ed. 497 (1952). Nevertheless, the ICC decision in In re Train Service on Northern Pacific, *supra,* coming only a few years after enactment of the car service provisions, is entitled to great weight as a contemporaneous interpretation by the agency charged with administering the statute. 2A Sutherland, Statutory Construction (4 ed.) §§ 49.03 to 49.05.

The PSC argues that this jurisdictional determination by the ICC is inapposite here because it involved a branch line crossing state borders. Arguably this distinction is irrelevant because the car service power is not limited to interstate commerce. Chicago, M., St. P. & P. R. Co. v. McCree & Co. 91 F. Supp. 57, 60 (D. Minn. 1950); 2 Sharfman, The Interstate Commerce Commission, p. 260; 3-A Id. pp. 55 to 66.

However, granting that the car service power extends even to intrastate commerce, the distinction does appear relevant to the question whether such power is exclusive. A concurrent state power is reserved in § 1(17)(a) as to "intrastate business." There is no explanation in legislative history or case law for the use of the term "intrastate business" rather than the more typical "intrastate commerce." That the branch line service is performed wholly within the state does not limit application of the Act if that service is a link in continuous interstate transportation. United States v. Illinois Terminal R. Co. 168 F. 546 (S. D. Ill. 1909) (branch line located wholly within the boundaries of Illinois nevertheless subject to the tariff-filing requirements of the Act because property was interchanged with connecting interstate lines); United States v. Union Stock Yard & Transit Co. 226 U. S. 286, 33 S. Ct. 83, 57 L. ed. 226 (1912) (terminal facility for loading and unloading livestock shipped in interstate commerce and railway company to which it leased its tracks both subject to the tariff-filing requirements of the Act); Texas &

New Orleans R. Co. v. Sabine Tram Co. 227 U. S. 111, 33 S. Ct. 229, 57 L. ed. 442 (1913) (lumber shipments by rail wholly within Texas under local bills of lading were subject to the Act because transshipped and rebilled at a gulf port for an ultimate destination in a foreign country); Philadelphia & Reading Ry. Co. v. Hancock, 253 U. S. 284, 40 S. Ct. 512, 64 L. ed. 907 (1920) (railroad employee covered by Federal Employers' Liability Act rather than state workmen's compensation law even though he worked on a train which transported coal from the mines to a freight yard two miles away in the same state because the ultimate destination of some of the cars was outside the state); Dearing v. United States, 167 F. 2d 310 (10 Cir. 1948) (accounting and reporting requirements of the Interstate Commerce Act applicable to fares collected from intrastate passengers by railroad operated wholly within Colorado but making connections with interstate trains); Taylor v. Fee, 233 F. 2d 251 (7 Cir. 1956) (applicability of labor arbitration provisions of Railway Labor Act contingent upon carrier being subject to the Interstate Commerce Act and found applicable to railroad operated in San Francisco harbor because railroad made connections with interstate carriers); Annotation, 74 L. ed. 188, 192. Accordingly, this branch line service is a link in interstate commerce and no concurrent state power over car service is reserved by § 1(17) (a) of the Act.

Once exclusive ICC jurisdiction is established with respect to the 82.1 percent of this traffic which moves in interstate commerce, it extends to the remaining 17.9 percent of intrastate shipments which are handled in the same trains. Colorado v. United States, 271 U. S. 153, 154, 164, 46 S. Ct. 452, 454, 70 L. ed. 878, 883 (1926); State of Illinois v. United States, 213 F. Supp. 83, 90 (N. D. Ill. 1962), affirmed, per curiam, 373 U. S. 378, 83 S. Ct. 1313, 10 L. ed. 2d 420 (1963).

Finally, the PSC argues that, while the ICC may have jurisdiction over "car service", what is involved here is a curtailment of "transportation service." The two concepts have been dis-

tinguished in Peoria & P. U. Ry. Co. v. United States, 263 U. S. 528, 44 S. Ct. 194, 68 L. ed. 427 (1924), as follows:

"* * * But 'car service' connotes the use to which the vehicles of transportation are put; not the transportation service rendered by means of them." 263 U. S. 533, 44 S. Ct. 196, 68 L. ed. 430.

The Peoria case involved an ICC order, issued without hearing pursuant to the emergency car service provisions in § 1, pars. (15) and (16), of the Act, requiring a carrier to perform switching services for another carrier. The court held that the emergency car service provisions, unlike other general powers by which switching could be compelled after hearing, did not confer power to order switching:

"* * * Moreover, switching service differs in character from those as to which such power is expressly granted. Those involve either the use by one carrier of property of another or the direction of the manner and the means by which the service of transportation shall be performed. The switching order here in question compels performance of the primary duty to receive and transport cars of a connecting carrier." 263 U. S. 535, 44 S. Ct. 196, 68 L. ed. 430.

Applying this distinction to the case at bar, it appears that if the BN sought to entirely discontinue and abandon its freight service over this branch line, the ICC could not act under its emergency car service power to compel performance of this primary duty. However, the ICC may regulate abandonment under § 1, pars. (18) to (20), of the Act. In contrast, where, as here, the BN intends to continue performing the primary transportation service but only seeks to change the manner of performance by curtailing the frequency of service, the car service provisions do apply. Indeed, as the ICC noted in In re Train Service on Northern Pacific, *supra*, § 1(10) of the Act explicitly includes "the supply of trains" in the definition of "car service."

Accordingly, we conclude that the service involved is inter-

state commerce subject to exclusive regulation by the ICC. It is not necessary to consider the powers of the PSC conferred by Minnesota statutes. The sole remedies of the communities and shippers involved are found in §§ 8 and 9 of the Act.

Let the writ issue.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.