459 N.W.2d 680 (1990)
R.S., an adult, Respondent,
v.
STATE of Minnesota and Hennepin County, Petitioners.
No. C6-89-824.
Supreme Court of Minnesota.
August 31, 1990.
*681 Thomas L. Johnson, Hennepin County Atty., Therese Galatowitsch, Minneapolis, and Hubert H. Humphrey, III, Atty. Gen., Julie K. Harris, David Iverson, St. Paul, for appellant.
*682 Dennis L. Smith, Dennis D. Daly, Roseville, Theodore J. Collins, Collins, Buckley, Sauntry & Haugh, St. Paul, for respondent.
William J. Jeronimus, Staff Atty., Mn. County Attys. Ass'n, St. Paul, amicus curiae.
Heard, considered and decided by the court en banc.
WAHL, Justice.
This appeal by the State of Minnesota (state) and Hennepin County (county) concerns the Minnesota Reporting of Maltreatment of Minors Act, Minnesota Statutes section 626.556 (1988), a difficult and delicate area of the law involving the protection of children and the rights of parents. At issue here is whether section 626.556, subdivision 10(c), which authorizes local welfare and law enforcement officials to interview suspected victims of child abuse without parental notification and consent, authorizes such an interview where there is an anonymous report of suspected abuse and no perpetrator has been identified, as the trial court held, or only when the child currently resides with or has resided with the alleged perpetrator, as the court of appeals held. R.S. v. State, 447 N.W.2d 205 (Minn.App.1989).
The express public policy of this state, as declared by the legislature in adopting the Act is:
to protect children whose health or welfare may be jeopardized through physical abuse, neglect or sexual abuse; to strengthen the family and make the home, school, and community safe for children by promoting responsible child care in all settings; and to provide, when necessary, a safe temporary or permanent home environment for physically or sexually abused children.
In addition, it is the policy of this state to require the reporting of neglect, physical or sexual abuse of children in the home, school, and community settings; to provide for the voluntary reporting of abuse or neglect of children; to require the assessment and investigation of the reports; and to provide protective and counseling services in appropriate cases.
Minn.Stat. § 626.556, subd. 1 (1988).
To assist child protection agencies in the required assessment and investigation of child abuse reports, the legislature enacted section 626.556, subd. 10(c), which provides:
(c) Authority of the local welfare agency responsible for assessing the child abuse report and of the local law enforcement agency for investigating the alleged abuse includes, but is not limited to, authority to interview, without parental consent, the alleged victim and any other minors who currently reside with or who have resided with the alleged perpetrator. The interview may take place at school * * * or other place where the alleged victim or other minors might be found and may take place outside the presence of the perpetrator or parent, legal custodian, guardian, or school official. * * * [T]he parent, legal custodian, or guardian shall be notified by the responsible local welfare or law enforcement agency no later than the conclusion of the investigation or assessment that this interview has occurred.
Minn.Stat. § 626.556, subd. 10(c) (1988). In reliance on subdivision 10(c) a Hennepin County Child Protection (HCCP) worker interviewed R.M.S., the eight-year-old daughter of R.S., without parental notice or consent on the basis of an anonymous report that R.M.S. was displaying inappropriate sexual conduct for a child of her age.
The facts are as follows: on November 12, 1987, HCCP services intake officer, Larrie Dee Price, received a phone call from an anonymous source that conveyed information that R.S. minor daughter, R.M.S., could be a victim of child abuse. The intake report stated:
Reporters say eight-year-old girl, R.M.S., is friend of their daughter. R.M.S. is exhibiting very sexual behavior; example, on Halloween, R.M.S. kissed the crotch of a skeleton. She has demonstrated sexual intercourse with Barbie dolls, she has masturbated on a couch, she lifts her dress, she refers to herself as a lesbian. Reporter has seen child *683 dance and point to her own genitals. She often talks about sexual intercourse. On two occasions R.M.S. has touched and twisted genital area in an aggressive manner and pressed on her buttocks and chest and also twisted her ears and nose. The last time was within the last month. Reporters see a [redacted][1] who advised them to report this.
In addition to taking down information which described the behavior of R.M.S., Price took R.M.S.' parent's names, address, telephone number and the name of her elementary school.
Pursuant to HCCP procedures, all telephone calls must be reviewed by the HCCP screener who is required to determine whether the call is a "report" requiring an "assessment" within the meaning of Minn. Stat. § 626.556, subd. 2(i), subd. 7. Price determined that the caller described sufficiently unusual behavior that the information could be considered a "report" of possible child maltreatment under the statute. In accordance with HCCP procedures, she forwarded the report to Terry Stark, supervisor of the intake unit. On November 16, 1987, Stark agreed that the anonymous call was a report, and he referred the case to Paula Leahy, a child protection worker, for an assessment. Stark and Leahy believed that the report contained allegations that might indicate that R.M.S. was the victim of sexual abuse.[2]
On November 18, 1987, Leahy orally notified the Golden Valley Police Department (GVPD) of the report and the next day sent written notice to the GVPD. Dennis Smith, a juvenile officer, was assigned to the case. Smith and Leahy determined that the appropriate method for assessing the need for protective services was to interview R.M.S. at school. They considered interviewing third parties but concluded that the in-school interview was the best way to determine the validity of the report.
On December 1, 1987, Smith orally notified the school principal that he and Leahy would be interviewing R.M.S. Neither Leahy nor Smith notified R.M.S.' parents. On December 2, 1987, Smith, in plain clothes, and Leahy went to Noble Elementary school to interview R.M.S. Kathy House, an administrative intern and special education teacher, took R.M.S. to a private room so that she could speak with Smith and Leahy. Leahy explained to R.M.S. that she, Leahy, went to schools to talk to children about "things that were happening to them." Leahy told R.M.S. that R.M.S. did not have to talk to her or to Smith or answer their questions. Both Smith and Leahy told R.M.S. that she was not in any kind of trouble. Leahy showed R.M.S. a picture called "My Body." R.M.S. was asked to show on the picture what was good touch and bad touch. Based on R.M.S.' answers to questions, such as whether she was being hurt by anyone, was anyone she knew touching her where she did not want them to, etc., Leahy and Smith concluded that R.M.S. was "open and honest in her answers * * * [and] [s]he gave no indication that she was being victimized * * *." According to Leahy's report, R.M.S. did not seem upset, she seemed open and comfortable and she answered questions honestly. After the interview, Leahy told R.M.S. that she would tell R.M.S.' parents about their talk and that R.M.S. could tell her parents if she wanted.
Leahy and Smith each filed a report on the interview of R.M.S. Both concluded that there was no indication of abuse. On December 3, 1987, Leahy wrote a letter to R.M.S.' parents notifying them that the child protection division "had recently received a report in regard to your family." On December 5, 1987, R.S. called Officer Smith when he was unable to contact Leahy. R.S. contacted Leahy on December 7, 1987 to discuss the report. At that time, *684 Leahy explained to R.S. that there was no evidence to substantiate the report of alleged sexual abuse. On December 8, 1987, the written notice of intent to interview was sent to school. It was backdated to December 2, 1987.
Not long after R.M.S. was interviewed, the anonymous reporter contacted HCCP and identified herself. On December 17, 1987, Leahy interviewed the reporter and her child. After interviewing all parties, HCCP closed the case with a finding of "unable to substantiate." "Unable to substantiate" is used when "the local social service agency has conducted an assessment in response to a report and not enough criteria for a substantiated report was present, but there is reason to suspect abuse or neglect."
On December 21, 1987, R.S. filed this declaratory judgment action against the state. On July 22, 1988, R.S. filed an amended complaint and joined Hennepin County to the action. The amended complaint alleged that section 626.556, subd. 10(c), was unconstitutional to the extent that HCCP was interpreting subdivision 10(c) to permit school interviews of children solely on the basis of anonymous reports and with no attempt to assess the validity of the report prior to the interview. In the alternative, the complaint requested a determination that an anonymous uncorroborated call to a welfare agency is not a "report" under the statute. On April 6, 1989, the Ramsey County District Court granted the motions of the state and county for summary judgment. Although finding that R.S. had no standing and had not set forth a justiciable controversy, the trial court reached the merits of the case, holding that anonymous report of child abuse are permitted under section 626.556, and that subdivision 10(c) "clearly allows school interviews without the consent of parents and without their presence."[3] R.S. appealed.
The court of appeals, affirming in part, and reversing in part, found a justiciable controversy and standing by R.S. to challenge the constitutionality of section 626.556. R.S. v. State, 447 N.W.2d 205, 209, 210 (Minn.App.1989). That holding has not been appealed to this court, nor has the holding that an anonymous, uncorroborated call may form the basis of a "report" within the meaning of the statute. Id. at 212. Those holdings stand. The court of appeals further declined to require law enforcement officials and welfare officials to conduct pre-interview assessments of reports but held that statutory procedures must be followed before an agency arranges a private interview without parental knowledge or consent. Id. In addressing the primary issue, the interviewing of children without parental consent upon receipt of an anonymous report that does not identify an alleged perpetrator, a majority court of appeals panel reversed the trial court's holding and interpreted the language of subdivision 10(c) to authorize an interview without parental notification and consent only when the victim currently resides with or has resided with the alleged perpetrator. Id. Judge Huspeni strongly disagreed in a special concurrence which interpreted subdivision 10(c) to grant authority to local welfare officials and law enforcement agencies to interview the reported victim without parental consent even when a perpetrator of the abuse has not been identified. Id. at 213-15 (Huspeni, J., concurring specially). The state and county petitioned for review.[4]
The issue to be decided is whether Minn. Stat. § 626.556, subd. 10(c), which authorizes an interview of a reported victim of child abuse without parental notice and consent, requires a specific allegation that the victim resides or has resided with the *685 alleged perpetrator. If subdivision 10(c) does permit interviews without parental notice and consent when the report does not name a perpetrator, the question then becomes whether section 626.556, subd. 10(c) violates respondent parent's constitutional right to familial privacy. Consideration of the statute must be informed at the outset, in our view, by some knowledge and understanding of the efforts of society in recent years to address and prevent the abuse of children.
Child abuse is not a new phenomena but its recognition as an appropriate public policy concern is of recent origin. In the past children were believed to be, not only the responsibility of their parents, but the exclusive property of their parents as well, making their abuse a family matter.[5] Since the early 1960's, however, when Dr. C. Henry Kempe and his associates introduced the "battered child syndrome" as a medical diagnosis for child maltreatment, there has been a growing consensus that it is appropriate for society to intervene in cases of familial abuse and neglect.[6] In the intervening decades, the federal government[7] and the states,[8] recognizing the magnitude of the problem of child abuse, its incidence and its consequences for children, their families and successive generations of abusers, have enacted legislation for the protection of children whose own "welfare may be jeopardized through physical abuse, neglect or sexual abuse." Minn.Stat. § 626.556, subd. 1.
The Minnesota Legislature has made clear in the Reporting of Maltreatment of Minor's Act, that while the primary responsibility for the care of protection of children lies with their parents, guardians or legal custodians, when the health or safety of children is jeopardized by these primary caretakers, the state, through its public agencies for child protection, will intervene. Section 626.556 requires certain persons to "report" the suspected maltreatment of a minor. Minn.Stat. § 626.556, subd. 3(a). The statute also provides for voluntary reporting by a person who "knows or has reason to believe a child is being * * * sexually abused * * *." Id. at subd. 3(b). The focus of the statute is on reporting suspected maltreatment of children by those people who care for children.[9] The definition of the "persons responsible for the care of a child" is set forth in subdivision 2(b).
"Person responsible for the child's care" means (1) an individual functioning within the family unit and having responsibilities for the care of the child such as a parent, guardian, or other person having similar care responsibilities, or (2) an individual functioning outside the family unit and having responsibilities for the care of the child such as a teacher, school administrator, or other lawful custodian of a child * * *.
Minn.Stat. § 626.556, subd. 2(b) (1988). Upon receipt of a report alleging abuse by a parent, guardian or individual functioning within the family, local welfare agencies are required to conduct an immediate, coordinated investigation and assessment. Id. at subd. 10(a). The agency must at the *686 same time offer protective social services to prevent further abuse, safeguard and enhance the welfare of the abused child and preserve family life whenever possible. Id. "`Assessment' includes authority to interview the child, the person or person responsible for the child's care, the alleged perpetrator, and any other person with knowledge * * *." Id. at subd. 2(i). Section 626.556, subd. 10(c) grants welfare officials the authority to interview alleged victims of child abuse without parental notice and consent.[10]
Respondent does not deny that a child may be interviewed without parental notice and consent if a parent or another person with whom the child lives or has lived is the alleged abuser. Respondent contends, however, that where there is no alleged perpetrator of suspected abuse or where, as in the report in this case, the perpetrator is unknown, parental consent is required for an interview. In support of this position, respondent cites subdivision 10(c). Respondent argues, and the majority of the court of appeals panel agreed, that the language of subdivision 10(c) granting authority to interview alleged victims without parental consent limits those who may be so interviewed not only to "any other minors who currently reside with or have resided with the alleged perpetrators" but to alleged victims who currently reside or have resided with the alleged perpetrator as well. Attempting to balance the possibly conflicting interests of child and parents by interpreting the "and" in the phrase "the alleged victim and any other minors" conjunctively, the court of appeals specifically held:
Absent an allegation that the parents are or may be involved in abuse, we hold parents must be contacted prior to the first interview with the child. Subdivision 10(c) authorizes an interview without parental consent only when the victim currently resides with or has resided with the alleged perpetrator.
R.S., 447 N.W.2d at 212. The court thought this approach "fair to both parents and child and provides the most protection for the child." Id. at 211.
The county and the state, on the other hand, argue that the plain language of subdivision 10(c) and purposes of the act cannot sustain such an interpretation. The decision of the court of appeals as it now stands, in their view, impedes their ability to efficiently assess the validity of a child abuse report, thus hindering them from carrying out their primary duty of identifying child abuse victims. Because so often only the child victim and perpetrator have actual specific knowledge of the abuse, the county and state assert, on the basis of their experience, that the assessment interview is the best means of assessing the truth or falsity of a report of abuse. They point to the case at hand, where the school interview led to a classification of the report as "unable to substantiate" and a closing of the file. Based on its reading of the act, including subdivision 10(c), the county, as a matter of policy, interviews alleged victims whenever the abuse report fails to identify the perpetrator. The county believes that parental involvement in the assessment process is contra-indicated in all cases where the parent is the perpetrator or where the perpetrator is unknown because to inform the parent of the report would taint the assessment process. The state asserts that DHS, the agency charged with supervising and administering laws relating to child protection, interprets Minn.Stat. § 626.556, subd. 10(c) to permit child protection workers to interview a child at school for the purpose of assessing a report of child abuse, without the knowledge and consent of the child's parents when the identity of the alleged perpetrator is unknown. The state argues that "[w]hen the meaning of a statute is doubtful, courts should give great weight to a construction placed on it by the Department charged with its administration." Mammenga v. State Dept. of Human Services, 442 N.W.2d 786, 792 (Minn.1989).
*687 The purpose of an in-school interview outside the presence of parents, guardians, or other persons responsible for the care of the child is so that welfare officials and police officers may obtain an untainted interview. The reasons for interviewing without parental consent when a parent is the alleged abuser are obvious. Children who are abused often have conflicting loyalties. They may lie to protect a parent. They may be afraid to reveal the truth. Their responses may be influenced by an abusive parent. An equally valid rationale supports permitting school interviews when the perpetrator is unknown.
Minnesota Statutes section 626.556 currently allows welfare officials to investigate allegations of abuse by people who fall within two broad groups: individuals functioning within the family unit who have responsibilities for the care of a child, and individuals functioning outside the family unit who have responsibilities for the care of a child. Looking at these definitions alone, the statute would appear to allow investigations into families where the alleged perpetrator does not necessarily reside with the child's family, but where he or she is within the family unit in the sense that the person is a relative or family-like person and cares for the alleged victim. Examples of possible perpetrators who do not live within a family unit per se, but who are "functioning within the family unit" and care for children are: grandparents, cousins, uncles, aunts or a single parent's "significant other." If subdivision 10(c) were read to require the victim to live with the perpetrator in order to interview a child without parental consent, a parent would be notified when these same persons were alleged to be perpetrators. When there is an allegation of abuse by a relative or close family friend, the concerns of parental interference are no less real than they would be if there were an allegation of abuse by one parent. If a family member living outside the home is in fact the perpetrator of abuse, the need for social services and police investigation are no less real. If subdivision 10(c) is read to require the alleged victim to live or have lived with the alleged perpetrator, the authority to investigate abuse by these people could be constrained and the very reason for allowing interviews of children without consent could be frustrated.
Section 626.556, subd. 10(c) is to be interpreted by its plain language and in the context of the act and its purposes.[11] Reading subdivision 10(c), as did the concurring judge of the court of appeals, we hold that Minn.Stat. § 626.556, subd. 10(c), which authorizes an interview of a reported victim of child abuse without parental notice and consent, does not require a specific allegation that the victim resides with or has resided with the alleged perpetrator. The report has set out the suspected abuse and has identified the alleged victim. Because other children may also be at risk, the legislature has clearly determined which other children should be identified and interviewed without parental consent: "any other minors who reside with or who have resided with the alleged perpetrator." The limits are drawn; they do not include every child who lives in the alleged victim's neighborhood.
Section 626.556, subd. 10(c), read in its entirety, supports the interpretation that interviews without consent are not limited to situations where the parent is the alleged perpetrator. Section 626.556, subd. 10(c) and other sections of subdivision 10 specifically refer to investigations where the alleged perpetrator is outside the family unit. For example, subdivision 10(b) refers to investigative authority when there is an allegation of abuse within a mental health or mental retardation facility. Similarly, subdivision 10(d), which sets out the procedures for interviews of children at school, states:

*688 Except where the alleged perpetrator is believed to be a school official or employee, the time and place, and manner of the interview on school premises shall be within the discretion of school officials, but the local welfare agency shall have the exclusive authority to determine who may attend the interview.
Minn.Stat. § 626.556, subd. 10(d) (1988) (emphasis added). This subdivision and subdivision 10(b) seem to contemplate situations other than those in which the suspected perpetrator is a household member. The definition of abuse within a family unit explicitly excludes such people as teachers, custodians, etc. See Minn.Stat. § 626.556, subd. 2(b). Moreover, as the concurring opinion points out, other provisions of subdivision 10 indicate that the authority to interview without parental consent extends to situations other than those where the victim lives or has lived with the alleged perpetrator. For example, immediately following the grant of authority to interview the "alleged victim and any other minors who reside with or have resided with the alleged perpetrator," the statute provides that "the interview may take place outside the presence of the perpetrator or parent, legal custodian, or school official." Subdivision 10(e) also seems to indicate that the victim need not live with the alleged perpetrator.
Where the perpetrator or person responsible for the care of the alleged victim or other minor prevents access to the victim or other minor by the local welfare agency, the juvenile court may order the parents, legal custodian, or guardian to produce the alleged victim or other minor * * *.
Minn.Stat. § 626.556, subd. 10(e) (1988) (emphasis added). Subdivision 10(c) identifies five categories of individuals, perpetrators, parents, legal custodians, guardians, and school officials. R.S., 447 N.W.2d at 214 (Huspeni, J., concurring specially). Based on the references to persons other than parental abusers, subdivision 10(c) is not limited to situations where the parent is the alleged perpetrator. "Distinctions of language in the same context must be presumed intentional and must be applied consistent with that intent." Transport Leasing Corp. v. State, 294 Minn. 134, 137, 199 N.W.2d 817, 819 (1972).
Our reading of the plain language of the statute read in the context of the entire Act leads to the conclusion that subdivision 10(c) does not require an allegation that a reported victim of child abuse resides with or has resided with the alleged perpetrator in order to interview the child victim without parental notice or consent. Legislative statement of policy and legislative history support this interpretation.[12] We are mindful that this case and the act itself present a difficult equation: to protect children from abuse and neglect while preserving family life whenever possible. The court of appeals correctly identified the two primary purposes of the act  protecting children and strengthening the family unit. In examining these interests in the context of answering the question presented, the court concluded that the opposing interests were best balanced if the circumstances in which welfare officials could interview children without parental consent were limited to situations where the alleged perpetrator of the abuse is someone who lives with the child. We note that in the declaration of public policy by the legislature with regard to the Reporting Act, the first and foremost interest identified is the protection of children and that the strengthening of the family unit in the context of the preamble, *689 refers to strengthening the dysfunctional family in which the child lives or to which the child may return. See State v. Andring, 342 N.W.2d 128, 132 (Minn.1984).[13] We cannot emphasize too strongly, however, the need for the state and counties to apply the act with sensitivity and to conform with its requirements.[14]
The question then becomes whether section 626.556, subd. 10(c), as applied to permit interviews without parental consent when the alleged perpetrator is not identified violates respondent's right to privacy in his family relationships. We conclude that it does not.
The United States Supreme Court has identified two ways in which state laws may unconstitutionally interfere with familial autonomy. In Re Agosto, 553 F.Supp. 1298, 1311 (D.Nev.1983) (familial privacy in the context of parent-child evidentiary privilege). The first way is when the state intrudes into the family structure or the definition of the family. See, e.g., Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). The second is when the state interferes with an individual's constitutional right to make certain decisions concerning the family unit. See, e.g., Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); see also Meyers v. Morris, 810 F.2d 1437, 1462 (8th Cir.1987) (noting liberty interest which parents and children have in the care and companionship of each other), cert. denied 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987). These cases by negative implication establish two "zones" of familial privacy. L. Tribe, American Constitutional Law § 15-20, at 1414-20 (2d ed. 1988). At issue in this case is the first privacy right; the intrusion by the state into respondent's family relationship.
In State v. Odenbrett, 349 N.W.2d 265, 269 (Minn.1984), we recognized that when there is an allegation of an interference by the state into a protected right of privacy, "[t]o consider the constitutional issue * * * require[s] * * * a balancing of the * * * interest in [the] privacy with the state's need to intrude on that privacy." In Odenbrett, we further noted that "[t]he state, of course, has a compelling interest in identifying and protecting victims of child abuse." Id. at 269 n. 5. When a state intrudes into the realm of familial privacy the state is also required to show that the law "facilitates the compelling state interest, and that, by comparison, the state's interest is more important." Agosto, 553 F.Supp. at 1312 (emphasis added) (citing Roe v. Wade, 410 U.S. 113, 153-55, 93 S.Ct. 705, 726-28, 35 L.Ed.2d 147 (1973)).
The court of appeals did not directly address the question of whether section 626.556, subd. 10(c) violates respondent's right to familial privacy. The court, however, indirectly answered the question by holding that the interests of parents in privacy and the interests of the state in protecting and identifying victims of child abuse were best balanced when welfare officials are permitted to interview children without parental notice and consent only when the alleged victim lives or has lived with the alleged perpetrator. Implicit in this holding is the conclusion that unless section 626.556, subd. 10(c) is narrowly construed, the interviews of children without parental consent may unconstitutionally interfere with respondent's right to familial privacy.
Respondent does have a constitutional right to familial privacy, but that right is not absolute. The state has a compelling interest in identifying and protecting abused children. It is clear to us, as it was to Judge Huspeni, that when *690 balancing the rights of parents and children:
it is imperative that we consider what the child and what the parent have at stake. The potential for present and future harm to the victim of child abuse is literally incalculable; the harm accruing to the liberty and privacy of a parent from one professional and benevolent interview of that child is minimal in comparison.
R.S., 447 N.W.2d at 214 (Huspeni, J., concurring specially). An interview of a suspected victim of child abuse without parental consent when the identification of the perpetrator is unknown is a reasonable means to effectuate the state's interest in identifying and protecting abused children. The discretion to conduct such an interview must be wisely and sensitively exercised. The interview  rightly implemented and conducted  is the fastest, most effective and least intrusive means of assessing the validity of a report of abuse. We therefore hold that Minn.Stat. § 626.556, subd. 10(c) as applied to permit an interview of a reported victim of child abuse without parental notice and consent when the alleged perpetrator is unknown does not violate the parent's right to familial privacy. We reverse the decision of the court of appeals.
Reversed.
POPOVICH, Chief Justice (dissenting).
I respectfully dissent and would affirm the court of appeals. The primary issue in this case is the interpretation of one sentence of a statute, Minn.Stat. § 626.556, subd. 10(c) (1988). This court's interpretation of statutes is guided by well established principles that require fidelity to legislative intent. Long-standing rules of statutory construction and the legislative history of Minn.Stat. § 626.556, subd. 10(c) make clear that the interview without parental consent provision was enacted to eradicate one problem: to grant welfare agencies the authority to interview allegedly abused children without parental consent only when a parent or other resident of the home is the alleged abuser. This interpretation squares with the most reasonable construction of the statutory language and is consistent with contemporaneous administrative rules. In light of the readily apparent, reasonable construction of the provision and clear legislative intent, I cannot read subdivision 10(c) to allow an interview of potential victims of child abuse without parental notification in the absence of an allegation that the parent or other resident of the home is the alleged child abuser.

I. Statutory Construction.

Rules of statutory construction dictate interpretation of subdivision 10(c) to require parental notice to interview without consent where a parent or member of the household is not the alleged abuser. Subdivision 10(c) provides in relevant part:
Authority of the local welfare agency responsible for assessing the child abuse report and of the local law enforcement agency for investigating the alleged abuse includes, but is not limited to, authority to interview, without parental consent, the alleged victim and any other minors who currently reside with or who have resided with the alleged perpetrator.
Minn.Stat. § 626.556, subd. 10(c) (1988). The key phrase at issue is "resided with the alleged perpetrator." In this case there was no allegation or evidence that R.M.S. "resided with the alleged perpetrator" of her abuse. If the legislature had intended this last phrase to be disjunctive and apply to only "other minors," it would have said "the alleged victim or any other minor." The use of the conjunctive "and" instead of the disjunctive "or" must be given effect unless the context dictates otherwise. See Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); Chisholm v. Davis, 207 Minn. 614, 617-18, 292 N.W. 268, 270 (1940). Here there is no basis to interpret "and" to actually mean "or" and thus contradict basic rules of grammar. "[C]ourts cannot supply that which the legislature purposely omits or inadvertently overlooks." Wallace v. Commissioner of Taxation, 289 Minn. 220, 230, 184 N.W.2d 588, 594 (1971). While two interpretations of *691 this language are possible, the only reasonable reading of the statutory language requires that "the alleged victim and any other minors * * * currently * * * reside * * * with the alleged perpetrator" for an interview without parental consent to be permissible.

II. Legislative Intent.

The sentence of subdivision 10(c) at issue is subject to more than one possible interpretation when the alleged perpetrator is unidentified. A statute is ambiguous when it is susceptible to more than one reasonable interpretation. Tuma v. Commissioner of Economic Sec., 386 N.W.2d 702, 706 (Minn.1986). When statutory language is ambiguous, legislative intent is to be ascertained and effectuated. Minn.Stat. § 645.16 (1988); see also Essling v. Markman, 335 N.W.2d 237, 240 (Minn.1983). Section 645.16 provides in relevant part:
The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature. * * *
* * * * * *
When the words of a law are not explicit, the intention of the legislature may be ascertained by considering, among other matters:
(1) The occasion and necessity for the law;
(2) The circumstances under which it was enacted;
(3) The mischief to be remedied;
(4) The object to be attained;
* * * * * *
(7) The contemporaneous legislative history;
* * * * * *
Minn.Stat. § 645.16 (1988). This court has generally adhered to the legislative mandate that legislative intent  when ascertainable  must be followed. "The object of all statutory construction and interpretation is to ascertain the intention of the legislature." Lemke v. Knudsen Trucking, Inc., 291 N.W.2d 378, 380 (Minn.1980). "Where * * * the language of a statute is ambiguous and two interpretations are possible, our role is to ascertain probable legislative intent and to give the statute a construction consistent with that intent." Beck v. City of St. Paul, 304 Minn. 438, 445, 231 N.W.2d 919, 923 (1975). Statutory interpretation and effectuation of legislative intent is strictly a matter of state procedural law.
The two general purposes of the child abuse reporting act are strengthening the family and protecting children. While these two purposes also exist for subdivision 10(c), legislators had a very specific problem in mind when enacting the first sentence of subdivision 10(c). Section 626.556, subdivision 10(c) was adopted in 1983. Act of June 14, 1983, ch. 345, § 17, 1983 Minn.Laws 2381, 2390. This bill originated in the Hennepin County Attorney's Office in a response to problems in the investigation and prosecution of child abuse cases. The first sentence of what is now subdivision 10(c) was enacted exactly as introduced. This provision went through the legislature in several different bills and was the subject of extensive public hearings. This court has often relied upon tapes of these public hearings in ascertaining legislative intent. See, e.g., Handle With Care, Inc. v. Department of Human Servs., 406 N.W.2d 518, 522 & n. 6 (Minn. 1987).
Public hearings regarding this provision make clear that the goal of the legislature in enacting the first sentence of subdivision 10(c) was to eliminate pressure by parent-perpetrators on abused children to not volunteer or to retract their allegations of abuse. Assistant Hennepin County Attorney Janeen Rosas, who apparently drafted this subdivision, presented this subdivision to the legislature for the first time stating:
The proposal is to permit the child protection people who have to investigate these reports [of abuse] to talk to these children without parents' consent so that the parent-perpetrator doesn't have a chance to come down to the child and say: `You keep your mouth shut.'
Hearings on S.F. 87, Sen.Health & Human Servs.Comm., 73rd Minn.Leg., Feb. 8, 1983 *692 (audio tape) [hereinafter 2/8/83 Hearings]. Tom Anzelc of the Department of Public Welfare testified this provision was aimed at the perpetrator in the home:
Lack of access to alleged child victims without parental consent or presence often results in children returning home to further maltreatment and abusive situations, therefore the Department [of Public Welfare] strongly supports those amendments to subdivision 10 which allow the interviewing of alleged victims outside the presence of the alleged perpetrator.

2/8/83 Hearings. Others also testified the goal of this subdivision was avoiding parent-perpetrator influence. Hearing on H.F. 107, H. Health & Welfare Comm., Social Servs. Subcomm., 73rd Minn.Leg., March 1, 1983 (audio tape) (comments of Barbara Kaufman, Executive Director, Minnesota Ass'n of Voluntary Serv. Agencies) [hereinafter 3/1/83 Hearings]; Hearing on S.F. 87, Sen.Jud.Comm., 73rd Minn.Leg., March 4, 1983 (audio tape) (comments of Marilyn Sheehan, Asst. Hennepin County Atty).
In considering subdivision 10(c), several legislators indicated it was aimed at the parent-perpetrator who would interfere and force the child-victim not to report or to change his or her story. The bill's chief author, Rep. Wynia, explained this goal and this subdivision: "This is in response to the concern that sometimes it's very difficult to talk to a child about these matters if there's a great deal of parental pressure placed on them not to report or say anything about the abuse." 3/1/83 Hearings. Statements of the sponsor of legislation "deserve to be accorded substantial weight in interpreting the statute." Federal Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 564, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976). Representative Onnen stated the problem the legislature was attempting to eliminate was "where there is sexual abuse or child abuse, those children may be submitted to considerable pressure so as not to testify." Hearing on H.F. 107, H. Health & Welfare Comm., 73rd Minn. Leg., March 8, 1983 (audio tape); see also 3/1/83 Hearings (comments of Reps. Brandl and Onnen). Subdivision 10(c) was clearly aimed at preventing the parent-perpetrator from intervening when authorities wished to interview their children about allegations of abuse.
Legislative history also demonstrates the chosen means of protecting parents rights was to have parents notified of an interview. Representative Wynia, the bill's chief author, made clear the general rule requires parental notification: "If there is going to be a requirement of notification to the parent, that there would be an escape valve so that in the event there was a fear that that notification might result in some kind of abuse that you didn't have to do the notification." 3/1/83 Hearing. Similarly, Rep. Onnen felt this subdivision would allow interviews without parental consent only when it was necessary to do so. 3/1/83 Hearings. No legislator indicated that they intended to permit children to be interviewed without parental consent where there was absolutely no allegation of the parent being the abuser. Others participating in the legislative process agreed subdivision 10(c) was not a broad grant of power to the local welfare agencies, but addressed the specific problem of parental pressure on a child abused by the parent. E.g., Hearing on S.F. 87, Sen.Jud.Comm., 73rd Minn.Leg., March 4, 1983 (audio tape) (comments of Marilyn Sheehan).
The majority expands the authority of local welfare agencies to interview without parental consent based on its determination that "[w]hen there is an allegation of abuse by a relative or close family friend, the concerns of parental interference are no less real than they would be if there were an allegation of abuse by one parent." R.S. v. State, 459 N.W.2d 680, 687 (Minn., 1990). The concern for parental interference, the majority feels, justifies an interview without parental consent even when the perpetrator is unknown. Id. at 687. This determination ignores the balance the legislature has struck in favor of the countervailing respect for the privacy of the family unit, as well as the potentially traumatic effect such an interview might have on the child. In this case R.M.S. was taken to a secluded spot to talk to an armed *693 police officer and a woman she did not know and was shown a picture and asked questions which any child may find, at the least, disturbing. The investigation of potential child abuse involves a delicate balancing of the need for effective and timely intervention and protection against the traumatic effects of interviews on both the child and the family unit. The act of balancing these interests has been performed by the legislature in subdivision 10(c), which restricts the authority of welfare officials to interview without parental consent to situations in which the alleged perpetrator is the parent or a resident of the home.
This court has previously respected the balance struck by the legislature among competing interests in dealing with the investigation of potential child abuse. In State v. Andring, 342 N.W.2d 128, 132 (Minn.1984) this court upheld the legislature's determination that the policies supporting the evidentiary medical privilege were outweighed by the need for effective prosecution of child abusers. We stated:
The legislature may well have decided that the need to discover incidents of child abuse and neglect outweighs the policies behind the medical privilege . . . [N]or can the legislature have intended. . . to permit total elimination of this important privilege.
Id. The same deference is due the legislature in its determination that familial privacy mandates a general rule requiring parental consent to interview potential victims of child abuse.[1]
Rather than rely on the balancing which the legislature has done, the majority relies on the policies surrounding investigation of child abuse and the context in which subdivision 10(c) resides to establish a presumption in favor of an interview without parental consent. The majority thereby expands subdivision 10(c) to cover far more cases  where parents or members of the home are not the alleged perpetrators  than the legislature originally intended. In doing so the majority cites other provisions of subdivision 10 which contemplate situations where the suspected perpetrator does not reside with the child-victim. R.S., 459 N.W.2d at 687-688. These provisions do not address the issue of parental consent, however. That the legislature provided for an interview outside the presence of potential perpetrators does not indicate that the interview may be conducted without parental consent. Similarly, the legislature's concern for the "chilling effect" of a school official's presence at an in-school interview evident in subdivision 10(d) says nothing about whether that interview can take place in the absence of parental consent. From the determination that the legislature contemplated situations in which alleged perpetrators may live outside the home, the majority concludes that interviews regarding potential abuse by these persons may take place in the absence of parental consent. *694 There is simply no authority for such a conclusion.
Section 645.16, the contemporaneous legislative history provision, dictates the result in this case. The factors set forth to determine legislative intent require this court to construe subdivision 10(c) as a limited exception to a general rule requiring parental consent. The purpose of subdivision 10(c) was to prevent parent-perpetrators from interfering with an interview of child-victims by local welfare agencies. The provision was proposed and adopted to address specific instances of parental influence in Hennepin County. The mischief to be remedied was parent-perpetrators influencing their children not to speak to authorities about abuse. This objective was to be obtained by giving welfare agencies the limited power to interview allegedly abused children without parental consent when a parent or other member of the home is the alleged perpetrator. The purpose of the provision and the circumstances surrounding the bill's passage establish the intent of the legislature regarding parental consent.
Accordingly, if the expansion of subdivision 10(c) to establish interviews without parental consent as the general rule is to take place, it should be accomplished by the legislature following public input. I believe the majority ignores legislative intent by failing to consider the object the legislature sought to accomplish when it enacted the interview without parental consent provision. The legislative intent indicates that interviews without parental notification are allowed only when the parent was the alleged abuser, and this court should respect that intent.

III. Administrative Interpretation.

When the legislative intent behind a statute is not clear, we have secondarily relied on an agency's contemporaneous interpretation of the statute in question. An agency's "determination is not binding on the court since an administrative agency may not finally decide the limits of its statutory power[, it, however,] is entitled to great weight as a contemporaneous interpretation by the agency charged with administering the statute." Burlington Northern, Inc. v. Department of Public Serv., 308 Minn. 43, 48-49, 240 N.W.2d 554, 557 (1976) (emphasis added).
The Department of Human Services' rules concerning interviews of children without parental consent only permit such interviews when there is an allegation of abuse within the family unit. The Department's rules divide allegations of maltreatment into two general categories: 1) within the home, and 2) outside the home. Minn.R. 9560.XXXX-XXXX.0222 (1989). Rule 9560.0220, entitled "Response to Reports of Maltreatment within the Family Unit," strictly limits the authority to interview: "The local agency may interview a child under this part without parental consent." Minn.R. 9560.0220, subp. 3C (1989). The Department's rules contain no other broad grant of authority to interview without parental consent for situations where there is no allegation of abuse within the family. Similarly, Hennepin County's rules on investigations and interviews without parental notice are basically identical to the Department's rules. Both the Department of Human Services and petitioner Hennepin County's own rules limit their authority to interview children without parental consent to situations where there is an allegation of abuse within a family unit.
Against the setting of Hennepin County's disregard of numerous statutory requirements in this case,[2] petitioners now *695 come to this court asking for a broadening of their governing statute that is contrary to the legislative intent and contrary to their own rules. Such a broadening of investigatory power is not advisable, especially if this case is typical of Hennepin County's procedures.[3] In addition, it should be noted the Department of Public Welfare's interpretation of subdivision 10(c) before the legislature in 1983 was consistent with the legislative intent. 2/8/83 Hearings (comments of Tom Anzelc, Department of Public Welfare).

IV. Conclusion.

This court is not a superlegislature; it does not weigh competing interests and write statutes on a clean slate. Statutory interpretation is strictly a matter of state procedural law. This court has no authority or basis to create a presumption, contrary to the legislative intent and the statutory language, that in all cases of alleged child abuse the parent is the actual abuser until proven otherwise.
Petitioners' position is that an anonymous allegation warrants a presumption that the parents, solely by virtue of the fact they are parents, are the abusers of their children until proven otherwise. Public policy cannot be furthered by a presumption which so completely ignores parental interests. Parents must be told when their children are suspected of being victims of abuse, especially when the parents are not the alleged abusers. Parents could provide a source of support by pacifying a child's fears about the interview, which could increase the likelihood of identifying the perpetrator. In this case neither of the parents was the alleged perpetrator, but an 8-year-old child was pulled out of school and interviewed. This procedure unnecessarily tarnishes innocent parents. In the majority of cases of alleged child abuse, no abuse is substantiated. Thus, absent specific and compelling reasons *696 to exclude individual parents from the interviewing process, parents should be involved whenever there is an allegation their child is abused. Parents must be presumed to act in the best interests of their children until proven otherwise. Parham, 442 U.S. at 602-03, 99 S.Ct. at 2504-05.
The balancing of the State's, the parents' and the child's interests is best left to the legislature with its wide ranging input. "It is not for the courts to make, amend, or change the statutory law, but only to apply it." State v. West, 285 Minn. 188, 197, 173 N.W.2d 468, 474 (1969). This court cannot give agencies authority the legislature did not intend them to have. In this case, this court has the limited role of interpreting the statute the legislature passed, not creating presumptions that will disrupt families. In light of the legislative history, the contemporaneous administrative interpretation, and the most reasonable statutory construction, the correct interpretation of Minn.Stat. § 626.556, subd. 10(c) allows interviewing alleged abused children without parental consent only when the parents or other member of the household is the alleged perpetrator. I therefore respectfully dissent.
KELLEY, Justice (dissenting).
I join in the dissent of Chief Justice Popovich.
YETKA, Justice (dissenting).
I dissent because the effect of the majority decision is to weaken further the family unit and the ties between children and their parents. It also extends the theory that a powerful state government is the only cure-all for all the problems of society.
I fully agree that if a child shows evidence of sexual abuse, that child should be interviewed by state and welfare authorities, but where the evidence points to someone other than in the family unit, the parents should be so notified. If preliminary evidence points to the parents as possible perpetrators, then, and only then, the interview should be allowed to take place in the absence of the parents. If the evidence points to no one in particular as the possible perpetrator, then the parents must be notified before the interview. Who has a greater right or a greater interest to be there? The argument is made that the perpetrator might be the parent and, for that reason, the parents should be excluded. The perpetrator also might be someone else  an acquaintance, a school employee or even a social worker or a policeman. What evidence is there that the parents only should be suspect and not someone in one of these other categories? Moreover, if the interview with the policeman and the social worker does raise a suspicion against one or both of the parents, I submit that, thereafter, that family will be watched closely and the facts ultimately will come to light. What are the consequences if the parents are not present? To have a 7-year-old girl brought into the presence of a policeman carrying firearms and a social worker interviewing her about intimate family life can have a very traumatic effect on that child. In my opinion, that effect can only be mitigated by the parents' presence to reassure that child. We extend greater protection to defendants charged with heinous crimes of murder and rape than the majority is willing to extend to a 7-year-old child in this case.
Moreover, I reject the theory that either a policeman or a social worker or the two of them in combination has a greater ability than a parent to glean the truth from the child's testimony. I also have doubts that enough experts exist in outstate Minnesota to provide the type of expertise needed in this type of interview absent the parents. True, there are a lot of poor parents out there today, but I submit that, hopefully, there are still far more good, decent parents who still want to bring their children up in a wholesome, healthy environment and who would be very helpful in arriving at the facts.
Children should be taught to respect their parents, and the school, police and public officials should be encouraged to strengthen the bonds between children and parents, not weaken them. For these reasons, *697 I dissent and I would affirm the court of appeals which, in my opinion, arrived at a very reasonable and sensible compromise on how to handle interviews of these children under these very difficult circumstances.
NOTES
[1] The reporter was apparently seeing a marriage counselor. When she advised the counselor of R.M.S.' behavior, the counselor urged the reporter to report R.M.S.' behavior to the authorities.
[2] The reporter described what some experts would consider to be "oversexualized behavior" for a child of her age. Oversexualized behavior in a child is a sign that the child may be a victim of sexual abuse.
[3] In the view of the trial court, "to ignore such anonymous reports or to delay the school interview by some independent investigation into their reliability would be to violate the statutory purpose and would be unreasonable." Order, filed April 5, 1989, memorandum, at 7, R.S. v. State, Ramsey County District Court, (C7-88-494029).
[4] The Minnesota County Attorneys Association, representing the county attorneys of Minnesota charged by statute with the prosecution of child abuse cases, filed an amicus curiae brief "to make known the statewide impact" of the court of appeals decision if not reversed.
[5] See F. Rush, The Best Kept Secret (1981).
[6] League of Women Voters of Minnesota, Protecting Minnesota's Children: Public Issues 2, (1986).
[7] In 1962 Congress required all states to create Child Protection Services by Title V-B, now IV-B, of the Social Security Act. The Child Abuse Prevention and Treatment Act of 1974, reauthorized in 1984, required, among other things, that each state designate an agency to receive reports of child maltreatment, provide immunity to mandated reporters, encourage voluntary reporting, and comply with certain definitions of abuse and neglect. The act also established the National Center or Child Abuse and Neglect which allocates funds for state projects. Protecting Minnesota's Children, supra note 6, at 5.
[8] Attorney General's Task Force on Child Abuse Within the Family, a Report to Hubert H. Humphrey III, Attorney General, October 2, 1986.
[9] With regard to the alleged perpetrator's relationship to the child, Department of Human Services data submitted to the trial court shows that of 19,319 alleged perpetrators in the year 1984, 76% were parents, 9% were other relatives and 15% were non-relatives; for 1986, of 21,744 alleged perpetrators, 78% were parents, 16% were other relatives, an and 6% were non-relatives. Minnesota Department of Human Services. Child Maltreatment Report 1985-1986 at 28.
[10] See generally Myers, A Survey of Child Abuse and Neglect Reporting Statutes, 10 J.Juv.L. 1 (1986).
[11] "A statute should ordinarily be construed as a whole to harmonize all its parts and, whenever possible, no word, phrase or sentence should be deemed superfluous, void or insignificant." Owens v. Federated Mut. Implement & Hardware Ins., 328 N.W.2d 162, 164 (Minn.1983). Further, "words of a statute are to be viewed in their setting, not isolated from their context." Chiodo v. Bd. of Educ., 298 Minn. 380, 382, 215 N.W.2d 806, 808 (1974).
[12] According to the sponsor of the 1984 amendments to section 626.556, subd. 10(d), part of the reason for the amendment which allowed welfare officials to exclude school officials from in-school interviews was because "school officials will grant an interview request, which is required under the law, but then they will add the condition that they must be present when that interview takes place on school grounds * * * [t]hat tends to have a chilling effect on what the authorities are able to find out during that type of interview, especially if the suspected abuse involves a member of the faculty at that school." Hearing on S.F. 1836, Sen.Jud.Comm., 73rd Minn.Leg., March 27, 1984 (audio tape) (comments by Sen. Petty). The concern of the committee of a "chilling effect on the interviews" because of the presence of school officials indicates that the sponsors of the bill intended that interviews of children were not limited to situations where parents were the suspected abusers.
[13] In fact, as one commentator has noted, "[i]mplicit in most recent child protective legislation is the legislative finding that the balance between children's rights and parents' rights must be weighted in favor of protecting children." Fontana, The Maltreated Children of Our Times, 23 Vil.L.Rev. 448, 461 (1977-78).
[14] As the court of appeals succinctly put it, the performance of mandated duties can be accomplished without resorting to the deliberate back-dating of official reports and the practice of signing statutorily required notices in blank. R.S., 447 N.W.2d at 212 n. 1.
[1] Even if a judicial balancing of interests was proper for this court, the majority's balancing is incorrect. The Supreme Court has stated how familial and governmental interests should be balanced when there is an allegation of child abuse:

[O]ur constitutional system long ago rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the duty, to recognize and prepare [their children] for additional obligations." Pierce v. Society of Sisters, 268 U.S. 510, 535 [45 S.Ct. 571, 573, 69 L.Ed. 1070] (1925). * * * The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children. * * *
As with so many other legal presumptions, experience and reality may rebut what the law accepts as a starting point; the incidence of child neglect and abuse cases attests to this. That some parents "may at times be acting against the interests of their children" * * * creates a basis for caution, but is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests. * * * The statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition.
Parham v. J.R., 442 U.S. 584, 602-03, 99 S.Ct. 2493, 2504-05, 61 L.Ed.2d 101 (1979) (citations omitted; emphasis in original).
[2] Petitioners concede that numerous statutory and regulatory errors were committed in the investigation of alleged abuse of R.M.S. The court of appeals pointed out the following investigatory errors by Hennepin County:

1. The failure to give the school a statutorily required notice;
2. The deliberate backdating of the required notice and mailing [respondent] a copy of the notice which they knew to be false;
3. The maintenance of that falsely dated notice in its records;
4. The failure to have a proper county chair or his designee review each notice;
5. The practice of signing these statutorily required notices in blank;
6. The failure to obtain as much information as possible from reporters including the practice of failing to ask if the caller knows or suspects who the perpetrator is;
7. The failure to get specific information supporting an allegation of physical or sexual abuse amounting to criminal acts;
8. The failure to require in every case of questioning a child which takes place without parental consent or knowledge that there be some evidence or even reasonable suspicion that the parent is the alleged perpetrator;
9. The practice of accepting anonymous calls as reports and based solely thereon  without making any attempt to assess the validity thereof  conducting custodial questioning without parental knowledge or consent;
10. The practice of waiting nearly three weeks before contacting the parents of a child the county believed may have been sexually abused where the parents were not alleged to be the source of the abuse.
R.S. v. State, 447 N.W.2d 205, 209 (Minn.App. 1989).
Hennepin County's investigatory procedures in this case appear quite similar to a prior case where an eighth circuit judge chastised the county:
I concur in the result reached by the court * * * but write separately to express some misgivings about due process and shock at the manner in which these child abuse cases were handled by local officials. * * *
* * * * * *
At the very least, the parents were entitled to demand that the State conduct a minimally adequate investigation * * *. Here, the social workers' lackadaisical attitude at the outset * * * is totally at odds with their subsequent haste * * *. Weight is added to appellants' due process claim by governmental reliance on what has been described charitably as "exaggerated" allegations and on "false inferences" by agency officials.
Doe v. Hennepin County, 858 F.2d 1325, 1330 (8th Cir.1987) (Henley, J., concurring), cert. denied, ___ U.S. ___, 109 S.Ct. 3161, 104 L.Ed.2d 1023 (1989). Judge Henley's "shock at the manner in which these child abuse cases were handled by local officials" is equally applicable to the R.M.S. investigation.
[3] If this report was serious enough for a social worker and an armed police officer to pull R.M.S. out of school without parental notice or consent, it certainly was serious enough for authorities to take some type of action in less than three weeks. The legislature has mandated that: "Any report shall be of sufficient content to identify the child, any person believed to be responsible for the abuse or neglect of the child if the person is known, the nature and extent of the abuse or neglect and the name and address of the reporter." Minn.Stat. § 626.556, subd. 7 (1988) (emphasis added). Hennepin County did not even attempt to meet these statutory requirements. If proper procedures would have been followed, including asking the reporter who the alleged perpetrator is, the statutory scheme could have worked as the legislature intended it. But where, as here, the county ignores the applicable procedures, it ends up making a post facto claim it has authority to interview without parental consent because it failed to ask who the suspected perpetrator might be.