657 N.W.2d 577 (2003)
In the Matter of the Child of P.T. and A.T., Parents.
No. C5-02-1508.
Court of Appeals of Minnesota.
March 4, 2003.
*580 Ruth Ann Webster, Gislason & Hunter, LLP, New Ulm, for appellant parents.
Mike Hatch, Attorney General, St. Paul; and Rachel Cornelius Androli, Jason L. Moran, Special Assistant Nicollet County Attorneys, Le Center, for respondent state.
Michelle M. Zehnder Fischer, Mackenzie & Gustafson, Ltd., St. Peter, for guardian ad litem Sharla Boyer.
Considered and decided by KALITOWSKI, Presiding Judge, HUDSON, Judge, and PORITSKY, Judge.[*]

OPINION
HUDSON, Judge.
Appellants' parental rights to their first four children were involuntarily terminated. Appellants now challenge the involuntary termination of their parental rights to their fifth child, M.T. Minn.Stat. § 260C.301, subd. 1(b)(4) (2002), creates a presumption of palpable unfitness to be a party to the parent-and-child relationship where parental rights to another child have been previously involuntarily terminated. In these circumstances, there is no requirement that reasonable efforts be made to rehabilitate and reunify the parents prior to a termination of parental rights. Minn.Stat. § 260C.001, subd. 3 (2002). Appellants argue that the statutory presumption of palpable unfitness in section 260C.301, subdivision 1(b)(4), unconstitutionally eliminates judicial review of an agency's reasonable efforts at rehabilitation and reunification, and violates appellants' due process and equal protection rights. Appellants also argue that the record does not support by clear and convincing evidence that appellants are palpably unfit to parent. We affirm.

FACTS
Appellants P.T. and A.T. are the parents of five children. The parental rights to their first four children, ages six, five, three, and two, were involuntarily terminated following a June 6, 2001, jury trial in LaCrosse, Wisconsin. On July 16, 2001, Nicollet County Social Services (NCSS) learned from LaCrosse County Social Services (LCSS) that A.T. was pregnant with the couple's fifth child, and was believed to be living in Nicollet County. LCSS was concerned about the unborn child due to appellants' neglect of their first four children. Gayle Robinson (Robinson), a child protection specialist for Nicollet County, was assigned to the case, and subsequently learned that A.T. was living with her parents in St. Peter, Minnesota. Robinson later learned that A.T. gave birth to M.T. on July 17, 2001, in Waconia, Minnesota.
From July 17, to August 14, 2001, Robinson worked to gather information regarding *581 appellants' current situation. According to Robinson, appellants were very hostile and difficult to work with. In addition, Robinson had difficulty with P.T.'s mother, J.W., who was similarly hostile and uncooperative. On August 15, 2001, Robinson requested that the Nicollet County Attorney's Office file a child in need of protection or services (CHIPS) petition on behalf of M.T. because Robinson believed that M.T. would suffer the same neglect as M.T.'s four siblings. Robinson based her belief on the fact that appellants did not seem willing to accept responsibility for their neglect of their other four children and seemed unrealistic in their plans for parenting M.T. NCSS filed a CHIPS petition on August 28, 2001, and sought immediate custody of M.T. At the CHIPS hearing on August 29, 2001, the district court denied NCSS' request for immediate custody, ordering that M.T. remain in the custody of appellants and continue to reside with A.T. at her parents' home. The district court also ordered that appellants' custody of M.T. be conditioned upon their cooperation with NCSS and guardian ad litem Sharla Boyer (Boyer). The court also appointed counsel from the public defender's office to represent appellants.
A pretrial hearing was scheduled for September 17, 2001. But prior to the hearing, NCSS and the guardian ad litem informed the district court that on September 10, 2001, A.T. contacted NCSS and voluntarily placed M.T. in foster care. A.T. expressed concern for M.T.'s safety because P.T. and P.T.'s mother had threatened to take M.T. away from her. A.T. also stated that she and P.T. continually argued. According to Robinson, A.T. felt sad and guilty because of the termination of parental rights of her other children and wished to immediately be relieved of her responsibility for M.T. NCSS accommodated A.T.'s request and arranged for A.T. to sign a voluntary placement agreement with NCSS for sixty days of foster care placement. The agreement stated that the agency agreed to develop a written out-of-home placement plan within 30 days. NCSS also told A.T. that the agency would arrange for visitations between M.T. and appellants during the time M.T. was in the agency's care to preserve the parent-child relationships.
The next day, A.T. again contacted NCSS. This time A.T. requested information about placing M.T. in protective custody because, according to A.T., P.T. and his mother had continued to threaten her. On September 12, 2001, A.T. contacted NCSS with second thoughts about voluntarily placing M.T. in foster care. A.T. said her friends had pressured her to get M.T. out of foster care, and that her parents were upset with her for placing M.T. in foster care. A.T. said that she would contact NCSS about her final decision concerning M.T.'s voluntary placement. A.T. never contacted NCSS.
On September 13, 2001, NCSS requested that the St. Peter Police Department place a 72-hour hold on M.T. for her safety. Robinson attempted to contact A.T. between September 12, and September 14, 2001, but was unable to locate her. In addition, Boyer informed the district court that she believed it was in M.T.'s best interest to remain in foster care. During this period, NCSS made no further attempts at rehabilitation or reunification of M.T. and appellants.
The district court held a hearing on the 72-hour hold on September 17, 2001 and found that M.T.'s health, safety, or welfare would be immediately endangered if M.T. were released to the care of appellants. The district court ordered that M.T. be placed in the temporary legal and physical custody of NCSS. The district court also *582 ordered that appellants each undergo individual parenting and psychological assessments, and were allowed supervised visitation with M.T., to be arranged through NCSS. Visitation was scheduled for two hours, once a week. The district court continued the November 21, 2001, CHIPS petition trial, pending the results of the parenting assessments.
NCSS received the results of the parenting assessments in the form of parental capacity evaluations completed by Counseling Services of Southern Minnesota, Inc. Appellants were interviewed extensively and underwent a battery of psychological testing. In addition, reports from Wisconsin child protection services were received and reviewed. Both evaluations recommended that appellants' parental rights be terminated. Specifically, with regard to A.T., the report found that A.T.'s dependent personality disorder prevents her from parenting properly. A.T. does not remember being nurtured, and she does not know how to be nurturing. A.T.'s personality disorder consists of deeply engrained behaviors and a highly inflexible pattern of functioning, likely resulting in a poor outcome with respect to treatment. Furthermore, A.T. does not know how to meet her own basic needs, much less those of M.T. Because of her personality disorder, A.T. relies exclusively on P.T. to care for her and help her with decision-making. The report also found that, despite past rehabilitative efforts, A.T. had failed to create a safe environment for M.T. The report concluded that it was highly likely that M.T.'s psychological, emotional, and physical well-being would be negatively impacted if M.T. were returned to appellants.
Similarly, the report concluded that, despite a variety of rehabilitative efforts, P.T. had failed in creating a safe environment for M.T. In addition, the report concluded that "P.T. lacks the parenting skills necessary to care for a young child." Furthermore, P.T. is diagnosed with an antisocial personality disorder and fails to conform to social norms, consistently acts in an irresponsible manner, lacks remorse for his actions, and fails to plan ahead. With regard to P.T.'s interaction with M.T., the report found that P.T. was not responsive to M.T.'s emotional needs, and he appeared to have significant deficits involving stimulation of M.T.'s needs, engaging her, or becoming attuned to her. Moreover, P.T.'s high level of defensiveness prevents him from adapting his behavior to different circumstances and indicates that he is likely unamenable to treatment.
On December 18, 2001, in response to the parental capacity evaluations, NCSS dismissed the CHIPS petition and filed a petition for termination of parental rights (TPR). The district court held the TPR trial on July 3, 2002. Brenda Todd-Bense (Todd-Bense), of Counseling Services of Southern Minnesota, Inc., testified as to the parental capacity report findings, and reiterated her conclusion that appellants' parental rights should be terminated. Steve Solberg (Solberg) of NCSS, testified as to difficulties in supervised visitation between appellants and M.T. Solberg said that appellants claimed they were unable to make visitation because of their lack of transportation. But Solberg noted that appellants were able to meet their other transportation needs, including trips to Wisconsin, without any apparent problems. Solberg also testified that, during supervised visitation, appellants had little physical contact with M.T. In addition, Boyer recommended the termination of appellants' parental rights, adopting the results of the parental capacity evaluations. Appellants did not testify or present any witnesses, relying instead on cross-examination of the state's witnesses. Following the TPR proceedings, the trial court concluded *583 that appellants were palpably unfit to parent M.T. and terminated appellants' parental rights. This appeal followed.

ISSUES
I. Does the statutory presumption of palpable unfitness in Minn.Stat. § 260C.301, subd. 1(b)(4) (2002), unconstitutionally eliminate judicial review of an agency's reasonable efforts at rehabilitation and reunification?
II. Does the statutory presumption of palpable unfitness in Minn.Stat. § 260C.301, subd. 1(b)(4) (2002), violate due process and equal protection rights?
III. Does the record support by clear and convincing evidence that appellants are palpably unfit to parent M.T.?

ANALYSIS
"In evaluating challenges to the constitutionality of statutes, this court recognizes that the interpretation of statutes is a question of law." In re Billie, 494 N.W.2d 877, 881 (Minn.1993) (citation omitted). Accordingly, we are not bound by the district court's legal conclusions. Id. "Minnesota statutes are presumed constitutional, and our power to declare a statute unconstitutional should be exercised with extreme caution and only when absolutely necessary." In re Haggerty, 448 N.W.2d 363, 364 (Minn.1989) (citation omitted). Appellants shoulder the burden of establishing beyond a reasonable doubt that the statute violates a claimed right. In re Conservatorship of Foster, 547 N.W.2d 81, 85 (Minn.1996).

I
Appellants argue that Minn.Stat. § 260C.301, subd. 1(b)(4) (2002), is unconstitutional because the statutory presumption of palpable unfitness eliminates judicial review of an agency's reasonable efforts at rehabilitation and reunification and denies them the opportunity to prove that they can parent their child. We believe that the issue, more succinctly stated, is whether Minn.Stat. § 260C.001, subd. 3 (2002), eliminating the reasonable efforts requirement in cases involving prior involuntary termination of parental rights, unconstitutionally eliminates judicial review of an agency's reasonable efforts.
Typically, the natural parent is presumed fit and suitable to care for his or her child, and we presume that the child's best interests entail remaining in that parent's care. In re Welfare of Clausen, 289 N.W.2d 153, 156 (Minn.1980). Moreover, the Minnesota Supreme Court has long recognized the substantial and fundamental rights of parents to enjoy the custody and companionship of their children and that a parent should not be deprived of these rights "except for grave and weighty reasons." In re Welfare of Rosenbloom, 266 N.W.2d 888, 889 (Minn.1978) (citations omitted).
But parental rights are not absolute and should not be
unduly exalted and enforced to the detriment of the child's welfare and happiness. The right of parentage is in the nature of a trust and is subject to parents' correlative duty to protect and care for the child.
In re Adoption of Anderson, 235 Minn. 192, 200, 50 N.W.2d 278, 284 (1951). Moreover, in any proceeding to terminate parental rights, the best interests of the child must be the paramount consideration. Minn.Stat. § 260C.301, subd. 7 (2002).
Generally, each CHIPS intervention requires a case plan that reflects the reasonable efforts of a social services agency to facilitate reunification of parent *584 and child. Minn.Stat. § 260.012 (2002) (outlining reasonable efforts for rehabilitation and reunification); Minn.Stat. § 260C.201, subd. 6 (2002) (requiring case plans with out-of-home placements). If implementation of the case plan is not successful, a party may petition for termination of parental rights. See Minn.Stat. § 260C.301, subds. 1, 2 (2002) (outlining voluntary and involuntary termination of parental rights). The party petitioning for termination must prove one or more of the statutory grounds by clear and convincing evidence. In re Welfare of J.S., 470 N.W.2d 697, 701 (Minn.App.1991), review denied (Minn. July 24, 1991).
In 1999, however, the Minnesota legislature substantially changed the laws governing child protection and juvenile delinquency. One such change was elimination of the "reasonable efforts" requirement under certain circumstances. Thus, the legislature amended section 260C.001 to provide, in pertinent part:
Subd. 3. Termination of parental rights. The purpose of the laws relating to termination of parental rights is to ensure that:
(1) when required and appropriate, reasonable efforts have been made by the social services agency to reunite the child with the child's parents in a home that is safe and permanent;
* * * *
Nothing in this section requires reasonable efforts to be made in circumstances where the court has determined that the child has been subjected to egregious harm or the parental rights of the parent to a sibling have been involuntarily terminated.

Id. (emphasis added). Upon a district court's determination that a person's parental rights to another child previously have been terminated involuntarily, reasonable efforts for rehabilitation and reunification are not required. Id.; Minn.Stat. § 260.012(a)(1)(ii) (2002). Further, a presumption of palpable unfitness attaches upon demonstration of involuntary termination of one's parental rights to one or more other children. Minn.Stat. § 260C.301, subd. 1(b)(4).
Accordingly, having had their parental rights to their first four children terminated, appellants are presumed to be palpably unfit to parent M.T. See Minn.Stat. § 260C.301, subd. 1(b)(4).
Appellants argue that by eliminating the requirement of rehabilitation and reunification efforts in these circumstances, the 1999 legislation unconstitutionally ended the court's supervision of agency decisions. Appellants rely on In re Welfare of S.Z., 547 N.W.2d 886 (Minn.1996), for the proposition that judicial review of an agency's reasonable efforts at rehabilitation and reunification is mandatory, and constitutionally required in every termination of parental rights case. In S.Z., the supreme court held:
We conclude that when parental rights are terminated because the parent is palpably unfit to be a party to the parent and child relationship, the Act requires that the court make the determination of whether reasonable efforts have been made to rehabilitate the parent and to reunite the family, even if that determination is that provision of services for the purpose of rehabilitation is not realistic under the circumstances.
Id. at 892 (emphasis added).
Appellants' reliance on this case is misplaced. The court's language is very clear: the Act (Juvenile Court Act) requires judicial review of an agency's reasonable efforts. Id. In other words, the right to mandatory judicial review of an agency's reasonable efforts at reunification was legislatively imposed by the Juvenile Court *585 Act; not the Minnesota Constitution. Id. Appellants cannot enhance a legislative dictate into a constitutional guarantee. Nor is a constitutional right to judicial review of an agency's reasonable efforts found in In re Welfare of L.A.F., 554 N.W.2d 393 (Minn.1996), the second case relied on by appellants. In L.A.F., the supreme court simply clarified that its earlier decision in S.Z. did not require involvement by a social service agency to prevent termination of parental rights in every case. Id. at 397. Both S.Z. and L.A.F. make clear that, in some circumstances, reasonable efforts may be futile, and it is properly left to the legislature to determine when reasonable efforts are required prior to termination of parental rights. And indeed, in 1999 the legislature amended the Juvenile Court Act to eliminate the need for reasonable efforts in a limited number of circumstances where the legislature determined that such efforts would be futile. One such circumstance is where a parent's rights to a previous child were involuntarily terminated.
Conspicuously absent from appellants' brief is a citation to the provision in the Minnesota Constitution that guarantees the right to judicial review of an agency's reasonable efforts in a parental termination case. "The party challenging a statute has the burden of demonstrating beyond a reasonable doubt a violation of some provision of the Minnesota Constitution." Haggerty, 448 N.W.2d at 364 (citation omitted). Appellants have failed to meet their burden.
A review of the record in this case lends support for the legislature's determination that reasonable efforts are not required when there has been a prior involuntary termination of parental rights. Here, appellants were hostile, uncooperative, and resisted NCSS's efforts to help them. Furthermore, the record amply demonstrates that reasonable efforts had been exhausted in Wisconsin to prevent removal of the appellants' other children. LCSS established specific conditions for appellants to satisfy in order to have their children returned to the home. LCSS offered numerous services to appellants, including psychological evaluations, assignment of a family support worker, parental education, parental skills training, and supervised visitation. Several family support workers would not or could not work with appellants because P.T. threatened the workers and their families. Parenting skills training had little impact on appellants' behavior or the "adolescent lifestyle" they presented. Supervised visitation was difficult and both appellants acted inappropriately. Appellants consistently failed to interact with the children and showed no interest in safety issues, causing a parental aide to intervene on several occasions.
In addition, the record indicates that the living arrangement "seriously endangered the physical health of the children." Indeed, local authorities condemned the house after the children's removal from the home. Inspection of the home revealed a number of alarming circumstances: dog feces on the floor; many dangerous items within reach of the children throughout the house; the children's mattresses were on the floor; and mice ran around the home and on their mattresses. The youngest child was very malnourished, and two of the children were diagnosed with mild hypotonia (low muscle tone) and chronic static encephalopathy (a brain disorder). Two of the children suffer from post-traumatic stress disorder (PTSD). The four children were never returned to the home. Significantly, Minnesota's involvement with the appellants began less than two months from the Wisconsin jury's finding that the children's best interest entailed termination of appellants' *586 parental rights, and within days of the Wisconsin court's determination that appellants were unfit to parent their other four children.[1]
Because we conclude that the Minnesota Constitution does not guarantee a right to judicial review of a social service agency's reasonable efforts at rehabilitation and reunification in parental termination cases, elimination of the reasonable efforts requirement in section 260C.001, subdivision 3, involving cases where there has been a prior involuntary termination, does not violate the Minnesota Constitution.

II
Appellants next argue that the statutory presumption of palpable unfitness in Minn. Stat. § 260C.301, subd. 1(b)(4) (2002), deprives them of their constitutional right to substantive and procedural due process under both the United States Constitution and the Minnesota Constitution. We disagree.
The due process clause provides that the state may not deprive a person of life, liberty, or property without due process of law. R.B. v.C.S., 536 N.W.2d 634, 638 (Minn.App.1995). "The fundamental requirement of due process is the opportunity to be heard `at a meaningful time in a meaningful manner.'" Brooks v. Comm'r of Pub. Safety, 584 N.W.2d 15, 19 (Minn. App.1998), review denied (Minn. Nov. 24, 1998) (quotation omitted).

Procedural Due Process
Appellants claim that several actions taken by NCSS improperly deprived them of procedural due process. Appellants first allege that NCSS misled A.T. with a promise of rehabilitation and reunification services as a way to obtain custody of M.T. The record does not support appellants' claim. On September 10, 2001, A.T. executed a voluntary out-of-home placement agreement ("the agreement"), placing M.T. in foster care from September 10, 2001, to November 9, 2001. Paragraph 3 of the agreement provides that the agency will develop a written out-of-home placement plan within 30 days. Paragraph 7 of the agreement provides that the agency will "[r]eturn the child to the parent * * * as soon as possible and no later than 24 hours after receipt of a written and dated request from the parent * * * unless * * * because of child protection concerns, this agency secures legal authority to continue placement outside the home * * *." Although appellants ascribe bad faith to NCSS's failure to develop a placement plan before seeking custody of M.T., A.T. did not relinquish custody of M.T. merely by signing the out-of-home placement agreement. The record shows that NCSS only placed a 72-hour hold on M.T. when, after telling NCSS that she would notify them of her final decision concerning M.T.'s voluntary placement, A.T. did not contact NCSS again. On September 17, 2001, the district court held a hearing concerning the 72-hour hold. At this hearing, the district court found that M.T.'s "health, *587 safety, or welfare would be immediately endangered" if she was released to appellants. Accordingly, the district court transferred custody of M.T. to NCSS. Significantly, appellants had the opportunity at this hearing to raise any challenges to the 72-hour hold or to otherwise voice concerns about how NCSS was handling their case.
Similarly, appellants maintain that NCSS manipulated the CHIPS process to separate M.T. from appellants in order to better its position in a subsequent termination of parental rights action. The due process implications of this claim are ill-defined; but in any event, the record demonstrates that appellants had ample opportunity to voice their concerns in a timely and meaningful manner. Once NCSS had custody of M.T., the district court ordered parental capacity evaluations and visitation. The parental capacity evaluations recommended that appellants' parental rights be terminated, and it was only after NCSS received the results of these evaluations that it dismissed the CHIPS petition and filed the TPR petition.
Moreover, NCSS could have immediately proceeded with a TPR petition, bypassing the CHIPS petition altogether. Minnesota law requires that the county attorney file a TPR petition within 30 days of the social services agency's determination that the parent previously and involuntarily lost parental rights to another child. Minn.Stat. § 260C.301, subd. 3(a) (2002). Therefore, NCSS was not required to file a CHIPS petition before filing a petition to involuntarily terminate appellants' parental rights. In any event, by virtue of the fact that NCSS first filed a CHIPS petition, appellants were provided with an additional opportunity prior to the TPR trial to establish their fitness as parents.
In addition, the TPR proceeding on July 3, 2002, provided appellants with a full hearing before an impartial decisionmaker. Appellants were present, each represented by separate counsel, and each had the opportunity to testify on his or her own behalf, and to present witnesses and refute the evidence against them. Moreover, appellants overlook the fact that the presumption is not created without the parent first being afforded these same procedural protections in a previous proceedingin this caseappellants' TPR trial in Wisconsin. During the Wisconsin TPR trial, appellants had the opportunity to present evidence, were represented by counsel, and put the state to its burden of demonstrating clear and convincing evidence of appellants' parental unfitness. Following the trial, the Wisconsin court found that reasonable efforts had been made to prevent the removal of the children from the home. Nevertheless, the Wisconsin trial court found that A.T. and P.T. were unfit to parent the children. Moreover, appellants exercised their right to appeal the jury verdict and the district court findings. The Wisconsin Court of Appeals affirmed all four terminations in an unpublished opinion and the Wisconsin Supreme Court denied further review of the case. In Re Termination of Parental Rights to Preston T., 251 Wis.2d 483, 640 N.W.2d 566 (Ct.App.2002) (table), review denied sub nom. La Crosse County Dep't Human Serv., 252 Wis.2d 152, 644 N.W.2d 688 (2002).
The due process standard in parental-termination proceedings embodies the notion of fundamental fairness. In re Welfare of J.W., 391 N.W.2d 791, 794 (Minn.1986) (holding refusal to allow parents in TPR proceeding to cross-examine opposing witnesses or present witnesses on own behalf not abuse of discretion or denial of due process). Fundamental fairness *588 guarantees a parent facing termination proceedings a right to a meaningful adversarial hearing. See In re Welfare L.J.B., 356 N.W.2d 394, 397 (Minn.App. 1984). Because appellants were afforded a meaningful adversarial hearing, we conclude that the statutory presumption of palpable unfitness set forth in section 260C.301, subdivision 1(b)(4), does not deny procedural due process to a parent facing termination of parental rights.

Substantive Due Process
Appellants also contend that the statutory presumption of palpable unfitness in section 260C.301, subdivision 1(b)(4), is unconstitutional because it denies a parent facing termination of parental rights the opportunity to raise his or her own children. Appellants have not fully briefed this argument, and therefore we need not decide this issue. See State, Dep't of Labor & Indus., 558 N.W.2d at 480 (holding court declines to reach issue in absence of adequate briefing). But in any case, the statutory presumption in section 260C.301, subdivision 1(b)(4), does not violate substantive due process.
There is a recognized substantive due process right to freedom from governmental interference in childrearing decisions. See, e.g., Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (striking down zoning ordinance prohibiting grandmother from raising two grandsons of different parentage); Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (allowing Amish to withdraw children from public school after completing eighth grade); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (striking down law prohibiting teaching foreign languages to schoolchildren). Parents have a fundamental interest in childrearing and in childbearing decisions. LaChapelle v. Mitten, 607 N.W.2d 151, 163 (Minn.App. 2000), review denied (Minn. May 16, 2000), cert. denied sub nom. Mitten v. LaChapelle, 531 U.S. 1011, 121 S.Ct. 565, 148 L.Ed.2d 485 (2000). Parents have a fundamental right to the custody and companionship of their children. In re Welfare of H.G.B., 306 N.W.2d 821, 825 (Minn.1981). In general, deprivation of this fundamental right, like most other fundamental rights, is subject to strict judicial scrutiny, meaning that the state bears the burden of proving that such deprivation is narrowly tailored to a compelling state interest. State ex rel. Morrow v. LaFleur, 590 N.W.2d 787, 796 (Minn.1999), cert. denied sub nom. Morrow v. Hvass, 528 U.S. 1013, 120 S.Ct. 517, 145 L.Ed.2d 400 (1999).
Here, the state's compelling interest is shielding children from parental abuse. R.S. v. State, 459 N.W.2d 680, 689 (Minn.1990). A parent who has had his or her parental rights involuntarily terminated has been adjudicated as posing a threat to the child now and into the future. See S.Z., 547 N.W.2d at 893. Generally speaking, the best evidence of how a parent will treat one child is how a parent has treated other children. Id. Consistent with strict scrutiny, the state may, as parens patriae, invoke its power to protect children "if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." Yoder, 406 U.S. at 233-34, 92 S.Ct. at 1542. Applying these standards, we hold that the statutory presumption furthers the compelling state interest of protecting children, such as M.T., from parents who have previously been found to be abusive to, or neglectful of, their children. Thus, the first prong of the strict scrutiny analysis is satisfied.
Furthermore, the statute is narrowly tailored to meet the state's compelling interest *589 in protecting children from abuse, meeting the second prong of the strict scrutiny analysis. The statutory presumption of palpable unfitness applies only to parents who previously have had their parental rights involuntarily terminated. Unlike parents who voluntarily terminate their parental rights, parents who have had their parental rights involuntarily terminated have been adjudicated to pose a continuing threat to the safety of their children. Therefore, the presumption only reaches people who have already demonstrated the potential to abuse or neglect their children.
We conclude that, because section 260C.301, subdivision 1(b)(4), is narrowly tailored to meet a compelling state interest, the statutory presumption of palpable unfitness does not violate substantive due process rights.

Equal Protection
Similarly, appellants contend that the statutory presumption of palpable unfitness in section 260C.301, subdivision 1(b)(4), violates equal protection by treating parents faced with a termination petition who challenge the petition and lose, differently from parents faced with a termination petition who, rather than challenge the petition and risk having the presumption attach, voluntarily terminate their parental rights. We disagree.
Equal protection requires that persons similarly situated be treated similarly, unless a distinction serves a legitimate governmental interest. Lidberg v. Steffen, 514 N.W.2d 779, 784 (Minn.1994) (citation omitted); LaChapelle, 607 N.W.2d at 165. Despite appellants' claim, parents who voluntarily terminate their parental rights are not situated similarly to those who have their rights terminated involuntarily.
While in both cases parental rights have been terminated, a parent who has had his or her parental rights involuntarily terminated has been adjudicated as failing to adequately provide for the child's health and safety; while a parent who has voluntarily terminated his or her parental rights has not been so adjudicated. See In re Welfare of J.D.N., 504 N.W.2d 54, 56 (Minn.App.1993) (circumstances that justify involuntary termination do not necessarily justify voluntary termination). The Equal Protection Clause does not require the state "to treat things that are different in fact or opinion as though they were the same in law." State v. Behl, 564 N.W.2d 560, 568 (Minn.1997). A state is not prevented by the equal protection clause from according two parents different legal rights, where one parent has been adjudicated as failing to shoulder the responsibilities for the child's "daily supervision, education, protection, or care." See R.B., 536 N.W.2d at 638 (quotation omitted).
There is a legitimate governmental interest in creating a presumption that a parent whose parental rights have been involuntarily terminated is an unfit parent. As previously stated, the state has a compelling interest in protecting children from abuse and neglect. R.S., 459 N.W.2d at 689. The paramount consideration in the child protection provisions of the Juvenile Court Act is the protection of children. Once a parent has been adjudicated unfit, the court has determined that it is likely the parent will continue to be unfit into the future. See, e.g., S.Z., 547 N.W.2d at 893 (when making termination decision, court should not rely primarily on history, but "to a great extent upon the projected permanency of the parent's inability to care for his or her child" (quotation omitted)); cf. In re Welfare of Chosa, 290 N.W.2d 766, 769 (Minn.1980) (holding termination of parental rights of 18-year-old unmarried mother was error where it did not *590 appear that the conditions leading to the termination would be "prolonged and indeterminate"); In re Welfare of J.K., 374 N.W.2d 463, 466 (Minn.App.1985) (holding parental rights of father erroneously terminated in absence of finding that parental misconduct would continue into indefinite future), review denied (Minn. Nov. 25, 1985). The wisdom of such a presumption is painfully evident where, as here, appellants' legal rights to several other children were involuntarily terminated by a jury's findings just one month prior, and a court order just three days after, the birth of appellants' fifth child.
By contrast, parents who voluntarily terminate their parental rights are not presumed to be unfit, because there has not been an adjudication of their unfitness. Such a presumption would, among other things, negatively impact adoption since voluntary terminations are often used to facilitate adoptions. See In re Welfare of Alle, 304 Minn. 254, 257, 230 N.W.2d 574, 576 (1975) (noting voluntary TPR proceedings facilitate adoption in some circumstances). Young parents who voluntarily terminate their parental rights in order to place the child for adoption would be discouraged from doing so if they would forever be presumed unfit to parent.
Appellants note that the "classic teenage unwed mother placing her child with an adoption agency" is not the only category of parents who voluntarily terminate their parental rights. Thus, appellants invite us to recognize an additional category of parents namely, parents facing an involuntary termination petition who voluntarily terminate their rights rather than risk losing at trial, and having the statutory presumption of palpable unfitness attach to any future child. According to appellants, these parents face a "threat" by the agency that their refusal to voluntarily terminate will result in never being able to raise any other child. In other words, appellants argue, the statutory presumption effectively coerces "voluntary" termination. We find four faults with this argument.
First, because each case is unique and must be decided on its own facts, it is speculative as to whether a given district court will involuntarily terminate parental rights. Second, it is likewise speculative as to whether the parent will have additional children. Third, in most instances, as here, the parent will be represented by counsel who will fully apprise the parent of the available options and the resulting consequences, thus lessening any potential for coercion. Fourth, the creation of any new category of parents who would be exempt from the statutory presumption is more properly a task for the legislature.
At present, the legislature has created two categories: voluntary termination (for whatever reason), and involuntary termination. Minn.Stat. § 260C.301, subd. 1(a), (b)(1-9) (2002). For parents who voluntarily terminate their parental rights, the statutory presumption of palpable unfitness does not attach. Should there be a subsequent termination proceeding, the parent can put the state to its burden of proof. On the other hand, parents who have had their rights involuntarily terminated have been adjudicated unfit, and the presumption of palpable unfitness follows with respect to any subsequent children. We note that the presumption does not relieve the state of meeting its burden of proving unfitness by clear and convincing evidence and parents have the opportunity to present witnesses and refute the evidence against them.
We conclude that parents who voluntarily terminate their parental rights are not similarly situated to parents whose rights have been terminated involuntarily. Accordingly, the statutory presumption of palpable unfitness in section 260C.301, *591 subdivision 1(b)(4), does not violate equal protection.

III
Finally, appellants contend that, without the statutory presumption of palpable unfitness, the record does not support by clear and convincing evidence that appellants are unfit to parent. We disagree.
"When a trial court's findings in a termination case are challenged, appellate courts are limited to determining whether the findings address the statutory criteria, whether those findings are supported by substantial evidence, and whether they are clearly erroneous." In re Welfare D.D.G., 558 N.W.2d 481, 484 (Minn.1997) (citation omitted).
"Parental rights are terminated only for grave and weighty reasons." In re Welfare of M.D.O., 462 N.W.2d 370, 375 (Minn.1990) (citation omitted). The legislature has established nine criteria that support termination of parental rights. See Minn.Stat. § 260C.301, subd. 1(b)(4) (2002). While only one criterion needs to be proven to support termination, the "paramount consideration" in every termination case is the child's best interest. Minn.Stat. § 260C.301, subd. 7 (2002).
Here, the trial court terminated appellants' parental rights on the ground that appellants were palpably unfit to parent M.T., pursuant to section 260C.301, subdivision 1(b)(4). This statute, in relevant part, provides:
[A] parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child. It is presumed that a parent is palpably unfit to be a party to the parent and child relationship upon a showing that the parent's parental rights to one or more other children were involuntarily terminated * * *.
Id. (emphasis added).
Boyer reported that P.T. has failed to demonstrate physical and emotional contact with M.T., while A.T. has demonstrated some physical contact, but has failed to make emotional contact. She concluded that appellants lack an understanding of their parenting deficits, and that these deficits are likely to continue into the foreseeable future. Solberg also testified to appellants' lack of intimacy with M.T. The parental capacity evaluations concluded that A.T. does not know how to be nurturing, and that P.T. lacks the parenting skills necessary to care for a child. Additionally, P.T. has a sporadic employment history, and is unlikely to have stable employment in the foreseeable future. P.T. was also diagnosed with an antisocial personality disorder and fails to conform to social norms and is consistently irresponsible and fails to plan ahead. Similarly, A.T. is not employed, and lacks the training and prospects for stable employment. This evidence establishes that appellants are unable to address M.T.'s physical, mental, and emotional needs now and in the reasonably foreseeable future.
Even without applying the statutory presumption of palpable unfitness, the record amply supports the trial court's conclusion that appellants are unfit to parent M.T. within the meaning of section 260C.301, subdivision 1(b)(4), and this conclusion is not clearly erroneous.

*592 DECISION
Because judicial review of an agency's reasonable efforts at rehabilitation and reunification in a termination of parental rights case is not a constitutionally guaranteed right, the elimination of reasonable efforts in Minn.Stat. § 260C.001, subd. 3 (2002), in cases where there has been a prior involuntary termination, does not violate the Minnesota Constitution. The statutory presumption of palpable unfitness to parent does not violate procedural or substantive due process or equal protection for three reasons: (1) Minn.Stat. § 260C.301, subd. 1(b)(4) (2002), is narrowly tailored to meet a compelling state interest; (2) appellants were provided a meaningful adversarial hearing prior to the termination of their parental rights; and (3) those subject to involuntary termination of parental rights are not similarly situated to those who voluntarily terminate parental rights. Lastly, the record amply supports the trial court's conclusion that appellants are palpably unfit to parent M.T., and this conclusion was not clearly erroneous.
Affirmed.
NOTES
[*] Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.
[1] Appellants also claim that the statutory presumption of palpable unfitness is an unconstitutional presumption. Appellants cite to State v. Kelly, 218 Minn. 247, 254, 15 N.W.2d 554, 559 (1944), which held that a statutory presumption is invalid if applied in either a civil or criminal proceeding, unless there is a logical connection between the proven fact and the presumed fact. But appellants have failed to provide any authority for why the statutory presumption in this case does not meet the above standard. Therefore, we decline to consider this argument. See State, Dep't of Labor and Indus. v. Wintz Parcel Drivers, Inc., 558 N.W.2d 480, 480 (Minn.1997) (court declines to reach an issue in the absence of adequate briefing).