*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-1608**

In the Matter of the Welfare of the Child of:
B. Q.-R. H., AKA: B. Q. R. H. AKA: B. Q.-R. H. AKA: B. Q. R. H.
and D. M. S., AKA: D. M. S., Parents.

**Filed April 29, 2024
Affirmed
Ross, Judge**

Olmsted County District Court
File No. 55-JV-22-8533

Daniel T. Donnelly, Donnelly Law Office, Austin, Minnesota (for appellant B.Q.-R.H.)

Mark Ostrem, Olmsted County Attorney, Deanna Varga, Associate County Attorney, Rochester, Minnesota (for respondent Olmsted County Health, Housing, and Human Services)

D.M.S., Rochester, Minnesota (self-represented respondent)

Jennifer Nguyen, Rochester, Minnesota (guardian ad litem)

Considered and decided by Ross, Presiding Judge; Larkin, Judge; and Klaphake, Judge.*

**NONPRECEDENTIAL OPINION**

**ROSS**, Judge

Police arrested appellant mother after she lashed her nine-year-old son's bare torso, arms, back, and legs more than 40 times with a belt inside a convenience store. Olmsted

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

County placed the boy in foster care and successfully petitioned the juvenile court to transfer custody of the mother's three-year-old daughter to the girl's father. Mother appeals, challenging the juvenile court's bases for determining that the girl is in need of protection or services, the juvenile court's ultimate transfer-of-legal-custody conclusion, and the juvenile court's credibility findings. Because the mother identifies no error or abuse of discretion in the juvenile court's transfer-of-custody order and because we do not second-guess a fact-finder's credibility findings, we affirm.

**FACTS**

Respondent Olmsted County Health, Housing, and Human Services became involved with mother (B.Q.-R.H.) in January 2022 because of reports that her nine-year-old son was attending school infrequently and that, when he did attend, he misbehaved, including by chasing school staff with scissors and throwing chairs and desks in the classroom. County staff learned that the boy often slept through the school day and attributed his sleepiness to watching videos all night and caring for his then three-year-old sister, who is the subject of this appeal, when mother worked overnight shifts. The county assigned two social workers to assist mother. They helped mother develop a case plan, which sought to address the following: the use of "physical discipline,"[1] mother's trauma

---

[1] Throughout the record, social workers and the district court negatively refer to "physical discipline," which, for clarity, we understand in this case to mean excessive or inappropriate physical discipline rather than physical discipline categorically. Our child-protection laws safeguard against "child abuse," which is defined as "an act that involves a minor victim that constitutes a violation of" enumerated laws, including the provisions that prohibit assault. Minn. Stat. §§ 260C.007, subd. 5, 299C.61, subd. 4 (2022). But the assault prohibitions include a corporal-punishment caveat. That is, Minnesota law provides that "reasonable force may be used upon or toward the person of another without the other's

and mental health, mother's use of marijuana, and the children's educational and medical needs.

Police received a phone call from mother one afternoon in May 2022 exclaiming that her son had run away and that she was going to hit him. She said that the boy had been viewing inappropriate online content on mother's phone and that he slapped her after she took the phone away. The boy, shirtless, shoeless, and wearing shorts, ran into the convenience store of a nearby gas station. The surveillance-camera footage from inside the store captures what happens next from multiple vantage points. The child appears to nervously wander around the aisles until mother and an acquaintance arrive. Mother, wielding a belt, chases the boy around until she corners and catches him. She then begins swinging the belt violently and rapidly at the boy, and he falls to his back in a somewhat curled position, using his arms and legs to try to defend against the blows. With what appears to be full force, mother strikes the boy with the belt again and again, more than 40 times, as he flails around in his unsuccessful defense. At one point, the video shows the boy grabbing the end of the belt, but this only stalls the attack because mother then punches

consent when . . . used by a parent, guardian, teacher, or other lawful custodian of a child or pupil, in the exercise of lawful authority, to . . . correct such child or pupil." Minn. Stat. § 609.06, subd. 1(6) (2022). And applying child-protection laws, the supreme court has been expressly "unwilling to establish a bright-line rule that the infliction of any pain constitutes either physical injury or physical abuse, because to do so would effectively prohibit all corporal punishment of children by their parents." *In re Welfare of Child. of N.F.*, 749 N.W.2d 802, 810 (Minn. 2008). The *N.F.* court considered whether two parents' paddling of their 12-year-old boy "on the back of the upper thighs with moderate force" constituted either mental or physical injury to warrant adjudicating the child to be in need of protection. *Id.* at 804. The court concluded, "[I]t is clear to us that the legislature did not intend to ban corporal punishment." *Id.* at 810.

3

the boy until he releases the belt and she continues the thrashing. The beating left the child's body covered with marks and caused him to temporarily lose hearing in his right ear. The video footage and photographs of the boy's welts reveal that mother lashed his chest, arms, back, and thighs.

County social workers took the boy to temporarily reside with his grandmother and his sister to reside with respondent father (D.M.S.). The girl has remained there at least through the time of this appeal.

The state charged mother with felony malicious punishment of a child and misdemeanor domestic assault. The district court issued a domestic-abuse no-contact order, prohibiting mother from any contact with the boy. Mother pleaded guilty to gross-misdemeanor malicious punishment of a child.

The county petitioned the juvenile court in August 2022 to terminate mother's parental rights to the boy and to adjudicate the girl in need of protection or services. Before a child-in-need-of-protection-or-services determination could be made, the county petitioned the juvenile court to transfer permanent legal and physical custody of the girl to father. Mother contested the petitions, and the juvenile court held a joint hearing on the termination of mother's parental rights to the boy and on the transfer of custody of the girl. The proceedings were delayed, however, because midway through the hearing, the juvenile court learned that mother's attorney had failed to provide mother significant portions of discovery. The juvenile court declared a mistrial, discharged mother's attorney, and appointed her new counsel.

The juvenile court conducted a second hearing in July 2023. The court received testimony and other evidence from multiple witnesses, including mother, social workers, a guardian ad litem, a parenting-time specialist, a behavioral coach, mother's alcohol and drug counselor, mother's psychotherapist, mother's probation officer, the boy's mental-health therapist, and three of the children's relatives. The testimony revealed that, for the most part, mother had failed to comply with the case plan or meaningfully participate in any services provided to her in the process. Those services included parenting-time sessions with the children, parenting coaching, drug counseling, and therapy. Mother's parenting visits with the children were "few and far between," and when she did visit them, she was often disengaged from the children or angry and hostile towards supervising social workers. Forensic interviews with the children revealed that mother's treatment of the boy captured on video was not unique, as she regularly "whoops" the boy with a shoe or a belt. The boy said that he prefers some belts more than others and that he hid an especially painful belt so that mother had to use a less-painful one.

Mother's testimony tended to blame her parental deficiencies on her mental-heath struggles, which she said result from traumatic life experiences. The evidence, corroborated by her own testimony and that of other witnesses, indicated that she smokes marijuana throughout the day and continually smells of it. Although she claimed that she smoked marijuana in her bedroom or closet but not in front of the children, multiple witnesses testified that the children regularly smelled like marijuana. Mother defended her lack of effort on the case plan by asserting that she had the impression that her children

5

would never be returned to her care and that efforts to meet the case plan's goals would be futile.

The children's guardian ad litem testified that, after viewing the girl's father parent her, she has no concerns with the girl's placement with him. The guardian ad litem also testified that she does not believe mother is presently capable of being a parent, as evidenced by her failure to comply with the case plan, her constant marijuana use, and her lack of parenting skills. The case workers opined that it would be unsafe for the children to return to mother's care.

The juvenile court determined the girl to need protection or services. It also ordered custody of the girl permanently transferred to father. Mother appeals those decisions. The juvenile court also terminated mother's parental rights to the boy, and that termination is the subject of a different appeal before this court.

**DECISION**

Mother raises three arguments on appeal. She first challenges the juvenile court's determination that the girl needs protection or services. She next argues that the juvenile court abused its discretion by permanently transferring custody of the girl to father. And she argues third that the juvenile court violated her due-process rights by making credibility findings without sufficient reasoning. None of her arguments persuades us to reverse.

**I**

Mother contests only one of the various grounds on which the juvenile court determined that the girl is in need of protection or services. The district court may adjudicate a child in need of protection or services if it finds by clear and convincing

evidence that one of several statutory bases exist to support the decision. *See* Minn. Stat. §§ 260C.007, subd. 6, 260C.163, subd. 1(a) (2022); Minn. R. Juv. Prot. P. 49.03. The county here asserted three statutory grounds for adjudicating the girl in need of protection or services, specifically, that the girl resided with a victim of child abuse, that she resided with a perpetrator of child abuse, and that she lacked the necessary parental care due to mother's emotional and mental instability, relying on Minnesota Statutes section 260C.007, subdivision 6(2)(ii), (2)(iii), and (8), respectively. The juvenile court found that the county proved all three bases, and mother now challenges only the third basis, which required the county to prove that the child "is without proper parental care because of the emotional, mental, or physical disability, or state of immaturity of the child's parent, guardian, or other custodian." Minn. Stat. § 260.007, subd. 6(8). Because mother does not challenge the juvenile court's determination as to the other two alternative bases on which it made its decision, we would have no reason to reverse even if she convinced us that the juvenile court erroneously relied on the sole challenged ground. We consider her argument on this point no further.

**II**

Mother next contends that the juvenile court erroneously transferred custody of the girl to father. The juvenile court may issue an order permanently transferring custody only by clear and convincing evidence and on findings addressing four circumstances:

> (1) how the child's best interests are served by the order;
>
> (2) the nature and extent of the responsible social services agency's reasonable efforts . . . to reunify the child with the parent or guardian . . . ;

7

(3) the parent's or parents' efforts and ability to use services to correct the conditions which led to the out-of-home placement; and

(4) that the conditions which led to the out-of-home placement have not been corrected so that the child can safely return home.

Minn. Stat. § 260C.517(a) (2022); *see also* Minn. R. Juv. Prot. P. 58.03, subd. 1 (establishing standard of proof). We review a juvenile court's factual findings for clear error and its finding of a statutory basis for the order for an abuse of discretion. *In re Welfare of Child of D.L.D.*, 865 N.W.2d 315, 321 (Minn. App. 2015), *rev. denied* (Minn. July 20, 2015). When reviewing a juvenile court's factual findings for clear error, we assess the evidence in the light most favorable to the findings, do not find our own facts, do not reweigh the evidence, and do not reconcile conflicting evidence. *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221–22 (Minn. 2021); *In re Welfare of Child of J.H.*, 968 N.W.2d 593, 601 n.6 (Minn. App. 2021) (applying *Kenney* to a review of a juvenile-protection order), *rev. denied* (Minn. Dec. 6, 2021). Mother challenges the juvenile court's findings on each factor.

Mother first challenges the juvenile court's finding that a permanent transfer of legal and physical custody is in the girl's best interests. As a threshold matter, mother contends that the best-interests factors in Minnesota Statutes section 260C.212, subdivision 2(b) (2022), and not section 260C.511, guide the analysis. But section 260C.212 "is limited to the situation in which a social-services agency is selecting an out-of-home placement," and no statutes governing permanency dispositions reference it. *In re Welfare of Child. of*

8

*J.C.L.*, 958 N.W.2d 653, 656 (Minn. App. 2021) (citing Minn. Stat. § 260C.212, subd. 2(b) (2020)), *rev. denied* (Minn. May 12, 2021). We are bound by our precedent in *J.C.L.*, *State v. M.L.A.*, 785 N.W.2d 763, 767 (Minn. App. 2010), *rev. denied* (Minn. Sept. 21, 2010), and we therefore apply Minnesota Statutes section 260C.511 (2022) to mother's best-interests challenge.

The juvenile court did not abuse its discretion in concluding that the girl's best interests were served by permanently transferring legal and physical custody to father. The best interests of the child is the paramount consideration in every juvenile-protection proceeding. Minn. Stat. § 260C.001, subd. 2(a) (2022). In permanency proceedings, "best interests of the child" includes all relevant factors. Minn. Stat. § 260C.511(a). This includes the relationship between the child and relatives, between the child and other key persons the child has lived with, and between the child and others with whom she has had significant contact. Minn. Stat. § 260C.511(b). Based on the relevant relationships, mother argues that the juvenile court failed to recognize that the gas-station beating was a one-time incident involving only the boy and that the girl has a special bond with mother. The argument fails.

Mother's assertions misstate the record and ask us to reweigh the evidence. The trial evidence included testimony from which the juvenile court could find that the gas-station incident was not a unique occurrence. Both the children told social workers that the boy had been "whoop[ed]" on multiple occasions. And the violence of this supposed one-time incident demonstrated such a shocking and unrestrained disregard for the physical and emotional wellbeing of one vulnerable child in mother's care that the juvenile court could

9

not reasonably ignore the risk mother poses to the other vulnerable child in her care. And although the girl may have a special bond with mother, she was only four years old at the time of trial, meaning that she had spent nearly half her life with her father. The juvenile court received abundant evidence that, with father, the girl had been living in a safe and loving home and that father was appropriately invested in the educational, emotional, physical, and other needs of the girl. We will not reweigh the evidence. *See Kenney*, 963 N.W.2d at 221–22. The juvenile court weighed the evidence and based its findings on that evidence. In doing so it considered the girl's relationship with both mother and father, analyzed mother's harmful conduct, and reasoned that transferring custody met the girl's best interests. The finding is amply supported.

Mother questions the juvenile court's conclusion that the county proved by clear and convincing evidence that it made reasonable efforts to reunify the girl with mother. Whether the county made reasonable efforts towards reunification "depends on the problem presented." *In re Welfare of Child. of T.R.*, 750 N.W.2d 656, 664 (Minn. 2008). The juvenile court considered the factors listed by statute as relevant to whether the county made reasonable efforts, as outlined in Minnesota Statutes section 260.012(h) (2022). It discussed the eight services the county offered mother and concluded that they were "appropriate, reasonable, available, and necessary." The juvenile court also found that mother's unwillingness to engage with the county made "reunification difficult at best" but that the efforts made were nevertheless reasonable.

Mother insists instead that the county's efforts were a "sham," in part because the county failed to offer family reunification therapy. Mother's contention arises from one of

the social worker's testimony at trial. The social worker testified, "[I]t is the agency's position that with respect to [the boy] after the assault that we had to file for the [termination of parental rights]. But, again, we don't know what the future is, so we always want to make sure that we're working towards reunification." Mother contends that this testimony proves that she could have followed the case plan perfectly and still never have been reunified with the girl. Mother's contention presents only a hypothetical circumstance, implying that we should reverse based on how the case *might* have turned out had she followed the case plan. The county offered mother numerous services that she mostly rejected. This included assisting her with scheduling and planning, helping her address her drug abuse, providing her a phone to better communicate with the county, offering her mental-health therapy, and recommending books and videos on proper parenting. The county also offered mother parenting time with the girl even after the no-contact order prohibited her contact with the boy, and mother did little to avail herself of this opportunity. The juvenile court did not abuse its discretion by concluding that the county made reasonable efforts to rehabilitate mother and reunify her with the girl.

Mother relatedly challenges the juvenile court's finding that she lacked the effort to correct the conditions leading to the girl's out-of-home placement. She points to her positive attendance with her probation officer, but this attendance had no bearing on her ability to parent or on the conditions requiring county involvement. The evidence supports the district court's finding that mother's routine marijuana impairment would not change because she exhibited no interest in abstaining. It was her lack of parenting skills that precipitated the out-of-home placement, and the record has plentiful support for the finding

11

that those deficient skills remained unchanged due to her lack of demonstrated interest in engaging in the services the county offered to counter her parental shortcomings.

It may be, as mother asserts, that she maintained stable housing and employment throughout the proceedings. But the record does not suggest that the county was concerned about any lack of housing or employment. The case plan sought to address mother's abusive so-called discipline, her trauma, her mental health, her use of marijuana, and the children's educational and medical needs. The juvenile court explained why it concluded that she had not addressed those issues, and its explanation finds support in the record.

**III**

Mother argues finally that the juvenile court violated her right to due process by failing to adequately explain why it found some witnesses credible and others not credible. She nowhere identifies the source of this alleged right. Her argument therefore fails for lack of legal support. *See State Dep't of Lab. & Indus. v. Witntz Parcel Drivers, Inc.*, 558 N.W.2d 480, 480 (Minn. 1997) (declining to address inadequately briefed question); *Melina v. Chaplin*, 327 N.W.2d 19, 20 (Minn. 1982) (noting that inadequately briefed questions are not properly before an appellate court); *In re Child of P.T.*, 657 N.W.2d 577, 586 n.1 (Minn. App. 2003) (applying *Wintz* in a juvenile-protection appeal), *rev. denied* (Minn. Apr. 15, 2003); *In re Welfare of Child of L.M.L.*, 730 N.W.2d 316, 322 (Minn. App. 2007) (applying *Melina* in a juvenile-protection matter). We add that the juvenile court clearly summarized the testimony of each witness and expressly indicated whether it found each witness's testimony credible. This meets the admonition that a juvenile court's findings are lacking when they "merely recite[] or summarize[]" testimony without

12

determining the credibility of witnesses. *In re Welfare of M.M.*, 452 N.W.2d 236, 239 (Minn. 1990). We agree that informing the parties why some testimony (or witness) is credible and others are not would more comprehensively explain a trial court's fact-finding rationale. But we are aware of no authority suggesting that findings of fact are subject to reversal when they lack a credibility explanation. Mother's credibility-sufficiency challenge fails.

**Affirmed.**